**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**NOV 22 2002**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

        Plaintiff - Appellee,

v.

WALTER JAMES JENKINS,

        Defendant - Appellant.

No. 01-1412

---

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 99-CR-439-01-S)**

---

Glen R. Anstine, Denver, Colorado, for Defendant-Appellant.

Robert Campbell Troyer, Assistant United States Attorney (John W. Suthers, United States Attorney, with him on the brief), Denver, Colorado, for Plaintiff-Appellee.

---

Before **LUCERO** and **ANDERSON**, Circuit Judges, and **BROWN**,[*] District Judge.

---

**BROWN**, District Judge.

---

[*]The Honorable Wesley E. Brown, United States Senior District Judge for the District of Kansas, sitting by designation.

Appellant Walter Jenkins was found guilty by a jury on charges of conspiracy to distribute more than 50 grams of crack cocaine (21 U.S.C. § 846); possession with intent to distribute more than 50 grams of crack cocaine (21 U.S.C. § 841(a)(1)); using or carrying a firearm during and in relation to a drug trafficking crime (18 U.S.C. § 924(c)(1)); and possession of firearms in furtherance of a drug trafficking crime (18 U.S.C. § 924(c)(1)(C)(i)).  He was sentenced by the district court to a total of 720 months' imprisonment.  In this direct appeal, appellant argues that the trial court erred in several of its rulings, including in its denial of his motion to suppress evidence and his motion to dismiss one of the § 924(c) counts.

I.

On October 28, 1999, Detective Mike Yeater of the Colorado Springs Police Department received a phone call from an individual who said he wanted to provide information about defendant Walter Jenkins' alleged involvement in drug trafficking, unlawful firearms possession, and other criminal activity.  The informant said he wanted to remain anonymous because he feared Jenkins, but he agreed to meet with Detective Yeater face-to-face and told Yeater to call him "Tony."  After receiving this call, Yeater attempted to corroborate some of the general biographical information the caller provided about the defendant.  Over the course of the next three weeks, "Tony" telephoned Yeater several times and met with him in person on at least two occasions.  In the course of these contacts, "Tony" provided more details about the defendant's alleged involvement in

narcotics trafficking.   Among other things, "Tony" claimed he had known the defendant for several months; that the defendant went by the name of "Smoke" and was a member of the West Side Mafia Crips gang out of Pomona, California; that the defendant claimed to have committed several drug and gang-related homicides in Pomona; that the defendant obtained large quantities of cocaine in Pomona and transported it in the headliner of his Chevrolet Suburban to Colorado Springs for distribution; that the defendant had been in Pomona about a month earlier and had obtained approximately one pound of cocaine;  that "Tony" had seen Jenkins with this pound of cocaine at the defendant's residence and helped the defendant cut and package it for sale; that "Tony" had been present when the defendant received calls on his cellular phone requesting cocaine and had seen the defendant send his live-in girlfriend Yolanda or "Londa" to the bedroom of their residence to obtain the requested amount of cocaine, which the defendant would then deliver to the customer at a nearby parking lot; that "Tony" had been present when an individual brought approximately $10,000 in cash to the defendant's residence as payment for previously purchased cocaine; that the defendant informed "Tony" about numerous firearms he owned and said he always carries a cheap .9 mm handgun on his person or within close reach; that "Tony" had seen the defendant in possession of various firearms;  that the defendant told "Tony" he kept part of his guns and cocaine at a nearby rented storage facility and he kept the rest at his residence; that the defendant associated with an individual known as "Dog" whom Tony had recently

seen purchase a handgun from the defendant; and that the defendant had recently been involved in a domestic dispute with his girlfriend Londa in which he had been arrested.

Yeater attempted to corroborate as much of the information as he could, and on November 30, 1999, he put the information he had gathered into an affidavit and presented it to an El Paso County Court judge in applications for warrants to search the defendant's residence, including vehicles associated to the property, and the defendant's nearby storage rental unit. The judge issued the warrants.

On the morning of December 1, 1999, a team of officers gathered to execute the warrants. Officers conducting surveillance of the defendant's house saw the defendant and his girlfriend, Yolanda Jefferson, leave the house and get into the defendant's Chevy Suburban and leave the premises. An officer tailing the Suburban saw it go through the drive-through lane of a nearby McDonald's restaurant and then head back towards the residence. Acting upon orders from a supervisor, the officer stopped the Suburban when it was about three-quarters of a mile away from the defendant's house. Officers searched the car and found a .9 mm semi-automatic handgun and ammunition in a console in the front seat. The defendant was arrested. He had $800 cash in his pockets at the time of his arrest. The police allowed Ms. Jefferson to drive the car back to the residence, where it was impounded. (At a later date, an inventory search of the Suburban revealed crack cocaine hidden in a bowling ball bag inside the car.)

Meanwhile, officers at the defendant's residence searched and found about 40

grams of crack cocaine, digital scales, and $11,000 in currency inside the house. A .45 caliber semi-automatic handgun with a loaded magazine was found in a station wagon on the premises. At the nearby storage unit used by the defendant, officers discovered a Jaguar automobile parked inside. Upon searching they found a backpack in the front seat with 292 grams of crack cocaine and approximately $15,000, and behind the front passenger seat they found four firearms and hundreds of rounds of ammunition. Another gun and some ammunition were located in a box next to the car. The officers also found several photographs of the defendant and other individuals posing with guns and large amounts of cash.

The defendant was charged in a four-count superseding indictment, and Yolanda Jefferson was named as a co-defendant in three of the counts. The defendant filed a motion to suppress evidence, which was denied by the district court. An eight-day joint trial of Jenkins and Jefferson ensued. At trial, the originally anonymous informant, Tony Tanniehill, testified about how he became acquainted with the defendant in 1999 and how in the months prior to Jenkins' arrest he agreed to sell crack cocaine for the defendant. He testified at length about the defendant's drug trafficking and possession of firearms. Other individuals also testified about their purchases of crack cocaine from the defendant and/or about their observations of the defendant engaging in the drug trade. The Government presented certain other witnesses, such as the manager of a motel near Pomona, California, who testified that records indicated the defendant had stayed at the

motel on September 27-30, 1999, and the Government also introduced the evidence seized from the defendant's house, cars, and storage unit. As indicated above, the jury convicted the defendant on all four counts of the superseding indictment.

II.

Jenkins' first contention is that the affidavit submitted in support of the search warrants failed to establish probable cause because Detective Yeater did not independently corroborate the informant's allegations of criminal activity. Appellant contends the officer merely corroborated innocent facts – such as the defendant's address and the types of cars he owned -- and he argues that such facts alone were not enough for probable cause. Citing, inter alia, Florida v. J.L., 529 U.S. 266 (2000). He argues that the evidence obtained with the warrants should have been suppressed. In response, the government contends that various factors demonstrated the reliability of the informant's allegations such that a finding of probable cause was warranted.

A magistrate's task in determining whether probable cause exists "is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit ..., including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983). Although an anonymous tip alone seldom demonstrates an informant's basis of knowledge or veracity, there are situations where such a tip, suitably corroborated, will suffice. Alabama v.

White, 496 U.S. 325, 327-29 (1990) (discussing whether anonymous tip was sufficient for investigatory stop); United States v. Danhauer, 229 F.3d 1002, 1006 (10th Cir. 2000) ("When there is sufficient independent corroboration of an informant's information, there is no need to establish the veracity of the informant.")  In Florida v. J.L., supra, the Supreme Court found that an anonymous tip to police that a particular person on a street corner was carrying a gun, without more, was not sufficient to justify an officer's stop and frisk of that person.  The Court said an anonymous tip must have some indicia of reliability in its assertion of illegal activity, not just in its tendency to describe or identify a specific person, if it is to provide reasonable suspicion for a Terry stop.  The same principle has been applied by this court in cases decided since J.L.  See, e.g., United States v. Tuter, 240 F.3d 1292 (10th Cir. 2001) and United States v. Danhauer, 229 F.3d 1002 (10th Cir. 2000).

We conclude that the informant's allegations in this case bore sufficient indicia of reliability such that, when considered with the other information supplied by the officer, the affidavit was sufficient to permit a finding of probable cause.  To begin with, although the informant declined to give his last name, the circumstances of his repeated discussions with the police – including at least two face-to-face meetings[1] – were such

---

[1] The Government asserts that at least four of the meetings between Tanniehill and Yeater were face-to-face.  It cites Yeater's testimony at trial as support for this assertion.  See Vol. 14 at 201-04.  As appellant correctly points out, however, the determination of probable cause must be made from the facts in the affidavit, not from the evidence

(continued...)

that they "place[d] his anonymity at risk." Cf. J.L., 529 U.S. at 276 (Kennedy, J., concurring). A reasonable person in such circumstances would realize that in all likelihood the police could, if they so chose, determine the person's identity, and could hold him responsible if his allegations turned out to be fabricated. Cf. id. at 270 (citing Adams v. Williams, 407 U.S. 143 (1972)). This provides a disincentive for making false allegations and "[a] court can consider this factor in weighing the reliability of the tip." Id. at 276 (Kennedy, J., concurring). See also United States v. Valentine, 232 F.3d 350, 354-55 (3rd Cir. 2000) (listing cases saying an informant's face-to-face tip is more reliable than an anonymous telephone call). Another relevant factor is that the informant claimed to have personally witnessed the defendant's drug transactions and provided a detailed description of how those transactions were carried out by the defendant and his girlfriend. In fact, the informant admitted to having assisted the defendant in preparing drugs for distribution. Cf. Gates, 462 U.S. at 234 (an informant's explicit and detailed description

---

[1](...continued)
presented at trial.

Detective Yeater's affidavit was ambiguous as to whether most of his "contacts" with Tanniehill were conducted over the telephone or in face-to-face meetings. The affidavit, which frequently referred to Tanniehill as "the caller," stated that Yeater had "four contacts with the caller since October 28, 1999." A review of the entire affidavit shows that at least two of the officer's "contacts" involved face-to-face meetings. The affidavit recounts that "[o]n October 28, 1999 the caller agreed to meet with Detective Yeater and Detective Terry Bjorndahl" and that "[w]hen the detectives met the caller, the caller still refused to give his/her name...." At a later point the affidavit states that "Detective Yeater later showed the caller numerous photos," and that the caller identified the individual he knew as "Dog." Vol. 1, Doc. 48 at 000336-37.

of alleged wrongdoing, along with a statement that the event was observed first-hand, entitles the tip to greater weight than might otherwise be the case).  See also United States v. Allen, 297 F.3d 790, 795 (8th Cir. 2002) (informant's statements against his own penal interest add to reliability);  United States v. Sturmoski, 971 F.2d 452, 457 (10th Cir. 1992) (same).

As appellant points out, Detective Yeater confirmed certain general information provided by the informant, such as the location of the defendant's residence and the types of cars he drove.  Corroboration of these facts alone is clearly insufficient for probable cause or even reasonable suspicion.  See United States v. Tuter, 240 F.3d 1292, 1297 (10th Cir. 2001) ("Almost anyone can describe the residents of, and vehicles at, a particular home without having any special knowledge of what goes on inside the home.")  But the extensive affidavit submitted by the officer in this case contained much more.  It included details indicating that "Tony" in fact had a relationship with the defendant, as shown by "Tony's" accurate assertions that the defendant had a birthday in September and had just turned 40 years old, that he had a storage rental unit near his residence, and that he had recently been arrested on a domestic violence charge.  In addition, Detective Yeater independently obtained information suggestive of the defendant's involvement in drug and gun possession that was consistent with the allegations of criminal activity made by the informant.  For example, Yeater stated in his affidavit that a detective in the Pomona California Police Department had been contacted and confirmed that the defendant was a

member of the Pomona West Side Mafia Crips gang who went by the name of "Smoke." According to Yeater's affidavit, "Tony" had identified a photograph of an associate of the defendant's (known only as "Dog") for Detective Yeater. Yeater's independent investigation showed that the individual's real name was Dwight Herrera, that he in fact went by the alias of "Dog," and that he too was a confirmed member of the Pomona West Side Mafia Crips. Yeater was informed by Colorado Springs homicide detective Terry Bjorndahl that Dwight Herrera had recently been seen in Pomona, California, together with his brother, who was wanted for first degree murder in El Paso County, Colorado. Yeater's affidavit recounts various information he obtained from other detectives relating to the defendant and to Dwight Herrera. Yeater was informed by Detective Brett Speirs of the Colorado Springs Police Department that he had received an anonymous tip in early January 1998 from a source in Denver who said Dwight Herrera was supplying cocaine he had obtained from Pomona, California, and that a black male named Walter Jenkins, also known as "Smoke Dog," had been Herrera's boss in the drug trade but there was now a turf battle over who was in charge of distribution of crack on the east side of Colorado Springs. Also, according to Yeater's affidavit, Jenkins and a man named Eric Amos had been stopped in California in January of 1998 with approximately $30,000 cash in their possession. Detective Speirs told Yeater that during a 1998 drug investigation, he was staking out an apartment building in Colorado Springs when he observed two males sitting in a car at the apartments for an extended period. Police

contacted the two men and identified them as Walter Jenkins and Eric Amos. Yeater's

affidavit further recounted that another Colorado Springs Police Detective, Tom Carle,

informed him of an anonymous tip Carle received in July of 1999 that Dwight Herrera

was dealing crack cocaine obtained from his California gang member friends, that

Herrera usually traveled to California with "Smoky Jenkins" and "Lionel Amos," and that

Herrera and "Smoky" got their cocaine from the same source but had separate drug

distribution businesses in Colorado Springs. As for "Tony's" claims relating to the

defendant's possession of firearms, Yeater was informed by an agent of the Bureau of

Alcohol, Tobacco & Firearms that records showed the defendant had purchased two

Intratec Tec-9 semi-automatic handguns in 1988. Additionally, Yeater determined from

police reports that during the defendant's recent domestic violence arrest, Jenkins had

been pursued by the police and had thrown two loaded firearms out of his car window,

including a .9 mm handgun. Yeater was also informed by another Colorado Springs

detective that the defendant had thirty-four prior arrests in California, including numerous

felony arrests for firearm violations, although he had only been convicted of

misdemeanors.

Unlike J.L., Danhauer and Tuter, the informant in this case risked his anonymity

by repeatedly meeting with or talking to the police, he provided a detailed account of the

defendant's alleged criminal activities and explained how he observed those activities

first-hand, and he made statements incriminating himself in the criminal activity.

Additionally, the police obtained independent information tending to support the details of the informant's allegations of criminal activity, including several details tending to suggest that the defendant was engaged in drug trafficking and gun possession.  This is true notwithstanding that some of the information in the affidavit came from other anonymous sources.  Cf. United States v. Sturmoski, 971 F.2d 452, 457 (10th Cir. 1992) (second informant's tip helped to corroborate information from first informant).  No single factor here is conclusive, but "the informant's story and the surrounding facts possessed an internal coherence that gave weight to the whole."  See Massachusetts v. Upton, 466 U.S. 727, 734 (1984).  Taken as a whole, the information in the affidavit suggested that "Tony's" allegations of criminal activity were reliable, and it provided a substantial basis for the judge's finding of probable cause.  See Gates, 462 U.S. at 243 n.13  ("probable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity").  Accordingly, we reject appellant's claim that the search warrants were invalid.

Appellant next challenges the district court's finding that the search of the defendant's Chevy Suburban on the morning of December 1, 1999, was authorized by the search warrant pertaining to the defendant's residence.  That warrant granted officers authority to enter and search "the residence at 5555 Trout Creek Pass Drive in Colorado, Springs, ... to include any outbuildings and vehicles associated to said property."  Appellant argues that because the Suburban was not at the residence when it was searched

on December 1, it was not "associated to said property" and was outside the scope of the warrant. The district court rejected this argument, concluding that the vehicle "does not become ... disassociated with the property by virtue of the fact that the owner takes it down to the corner to buy a hamburger and then starts back toward the property,..." Vol. 7 at 39.

The facts of this case present a novel question concerning the appropriate scope of the search warrant, but we need not address that issue. We conclude that the officers' search of the Suburban on December 1 was lawful because there was probable cause to believe the vehicle contained evidence of a crime. As such, the search was valid under the "auto exception" to the warrant requirement. See Carroll v. United States, 267 U.S. 132, 151 (1925) (recognizing exception to warrant requirement for automobiles). We noted above that Detective Yeater's affidavit was sufficient to show probable cause that the defendant was engaged in cocaine trafficking and unlawful possession of firearms. As noted by the search warrant, evidence of such crimes would include illicit drugs, firearms, items showing occupancy for 5555 Trout Creek Pass Drive, and receipts showing expenses for trips to California. Based on the facts known to officers on December 1, there was a fair probability that such items would be found in the defendant's Suburban. In addition to all of the foregoing information, the police were aware of the informant's reports that the defendant transported cocaine from California in the headliner of the Suburban, that he possessed cocaine in the Suburban just before his

-13-

arrest for domestic violence, and that he always carried a .9 mm handgun on or near him.

Officers were also aware that the defendant had been in possession of loaded firearms in

a vehicle just before his recent arrest for domestic violence. Under the totality of the

circumstances, the police were aware of facts establishing a fair probability that evidence

of the defendant's drug trafficking or unlawful firearms possession would be found in the

Suburban. The search was therefore reasonable under the Fourth Amendment.[2]

### III.

Appellant's next contention is that the district court erred by denying his motion to

dismiss Count Three of the superseding indictment or his alternative request for a bill of

particulars on that count. In the district court, appellant argued that Counts Three and

Four covered the same criminal behavior and were therefore multiplicitous. Vol. 1, Doc.

70 at 2. Both of these counts charged a violation of 18 U.S.C. § 924(c). As an alternative

to dismissal, appellant argued that a bill of particulars was required because Count Three

failed to set forth sufficient facts to protect against double jeopardy. Vol. 1, Doc. 71 at 2.

Appellant's multiplicity argument is not spelled out in great detail in his brief, but it

appears to be based on an assertion that Counts Three and Four were premised on the

same underlying drug trafficking crime.

Multiplicitous counts are separately charged counts that are based on the same

---

[2] Our conclusions that the warrant was valid and the search of the Suburban was reasonable render moot appellant's arguments about the good faith doctrine of United States v. Leon, 468 U.S. 897 (1984). See Aplt. Br. at 24.

-14-

criminal behavior. <u>United States v. McIntosh</u>, 124 F.3d 1330, 1336 (10th Cir. 1997).

They are improper because they allow multiple punishments for a single criminal offense.

<u>Id.</u> Appellant's multiplicity argument fails here because Counts Three and Four were not

based on the same criminal behavior. Count Three charged the defendant with using or

carrying a firearm in or about August 1999, during and in relation to the drug conspiracy

charged in Count One. Count Four, on the other hand, was based on defendant's

possession of five firearms on December 1, 1999, in furtherance of the offense of

possession with intent to distribute crack cocaine charged in Count Two. <u>See</u> <u>United

States v. Sturmoski</u>, 971 F.2d 452, 461 (10th Cir. 1992) (consecutive sentences may be

imposed for multiple 924(c) counts if the offenses underlying each count do not constitute

a single offense for double jeopardy purposes). Even if the underlying drug crimes here

were related in the sense that drug possession was an object of the conspiracy, a

conspiracy to commit an offense and the actual commission of the offense are separate

crimes and may be punished separately. <u>See</u> <u>United States v. Callwood</u>, 66 F.3d 1110,

1115 (10th Cir. 1995); <u>United States v. Johnson</u>, 977 F.2d 1360, 1371 (10th Cir. 1992) ;

<u>United States v. Abreu</u>, 962 F.2d 1425, 1430 (10th Cir. 1992) (finding that conspiracy and

possession charges were separate offenses, and therefore separate drug trafficking crimes

within the meaning of § 924(c)), <u>on reh'g</u>, 962 F.2d 1447; <u>vacated on other grounds</u>, 508

U.S. 935 (1993); <u>on remand</u>, 997 F.2d 825. Accordingly, Counts Three and Four

charged separate offenses and were not multiplicitous.

-15-

The record surrounding defendant's request for a bill of particulars further clarifies this point, as it shows that the counts were not only based on separate predicate drug offenses, but also involved different handguns and occurred several months apart. In response to defendant's argument that he could not determine the basis of Count Three without a bill of particulars, the government disclosed at a pre-trial hearing that the firearm described in Count Three had never been recovered and the charge was based on the testimony of the informant, who would testify that he had seen the defendant in possession of a "cheap 9-millimeter semi-automatic handgun" in August of 1999 when the informant and the defendant distributed crack cocaine. Count Four, by contrast, charged the defendant with possessing a Model 75 .9 mm handgun and other firearms on December 1, 1999, when this firearm and others were found in the defendant's storage rental unit together with a stash of crack cocaine. At the pre-trial hearing, the government further disclosed that the informant told police that the .9 mm handgun identified in Count Four was not the same .9 mm handgun he had seen the defendant carry in August of 1999. The informant's testimony at trial was consistent with these representations. Given this full disclosure before trial, and the absence of any showing of unfair surprise at trial, we conclude that the district court did not err when it denied Mr. Jenkins' motion for a bill of particulars as to Count Three. See United States v. Sturmoski, 971 F.2d 452, 460 (10th Cir. 1992) (district court did not abuse its discretion in denying bill of particulars where defendant received full discovery and showed no prejudice).

IV.

Appellant's next contention is that the evidence was insufficient to support the verdict on Count Four. As noted above, Count Four charged defendant with the unlawful possession of firearms in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c). Appellant concedes the evidence was sufficient to show that he had constructive possession of the firearms described in Count Four, but argues there was no evidence the firearms were used "in furtherance of" the possession with intent to distribute crack cocaine.

The test for determining whether a jury's finding of guilt is supported by the evidence is whether, "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." See Jackson v. Virginia, 443 U.S. 307, 319 (1979). The "in furtherance of" element of § 924(c) requires the government to show that possession of the firearm furthered, promoted or advanced the drug trafficking crime. United States v. Avery, 295 F.3d 1158, 1175 (10th Cir. 2002). Relevant factors include "the type of drug activity being conducted, the accessibility of the firearm, the type of firearm, the legal status of the firearm, whether the firearm is loaded, the proximity of the firearm to the drugs or drug profits, and the time and circumstances under which the firearm is found." United States v. Basham, 268 F.3d 1199, 1208 (10th Cir. 2001).

Under these standards, we conclude that the evidence was sufficient to support the

verdict on Count Four. Four of the firearms listed in Count Four were found in the passenger compartment of the car at the storage rental unit used by the defendant, together with hundreds of rounds of ammunition of various types. Also found inside the car were nearly 300 grams of crack cocaine and over $15,000 in cash. The ammunition in the car included two high-capacity rifle magazines taped together, loaded with approximately 30 rounds of ammunition of the type used in the SKS rifle listed in Count Four. At least one of the firearms was loaded, and the evidence suggested an attempt had been made to file off the serial number from one of the other guns. Vol. 14 at 371-74. The defendant's placement of guns and drugs at the same site was not unique to the storage unit; the evidence showed that he also kept guns and drugs at his residence and in his Chevy Suburban. In addition to the circumstances mentioned above, there was testimony from several witnesses suggesting that the defendant always had a firearm nearby when he conducted his drug business. Vol. 17 at 668-70; Vol. 18 at 33; Vol. 19 at 29-31. There was testimony that the defendant told Tony Tanniehill not to buy him another gun because he already had so many. Vol. 17 at 670. One witness testified that in the same room of the defendant's house where crack cocaine was kept, the defendant displayed various guns to him including a MAK 90 rifle, the same type of rifle described in Count Four. Id. at 30-31. That same witness also testified that although he sometimes stole to support his drug habit, he would not think of stealing from the defendant because he was "afraid of getting shot." Id. Taken as a whole, the evidence at trial would support

a finding that the defendant possessed the firearms listed in Count Four for the purpose of protecting his cocaine supplies and illicit drug proceeds, and that his possession of the guns was in furtherance of his drug trafficking crime.

V.

Appellant's final argument is that the trial court erred by admitting into evidence photographs of Mr. Jenkins and others holding firearms and large amounts of cash. These photographs were found by the police inside Mr. Jenkins' storage rental unit. Appellant argues the photos were irrelevant and should have been excluded because of the danger of unfair prejudice.

We review questions concerning the admission of evidence under an abuse of discretion standard. Under that standard, we will not disturb an evidentiary ruling absent a distinct showing that it was based on a clearly erroneous finding of fact or an erroneous conclusion of law or manifests a clear error in judgment. United States v. Mitchell, 113 F.3d 1528, 1531 (10th Cir. 1997) (quoting Cartier v. Jackson, 59 F.3d 1046, 1048 (10th Cir. 1995)).

We find no abuse of discretion in the trial court's decision to admit these photographs. Contrary to appellant's suggestion, the photos were relevant to numerous issues at trial. They served to corroborate the testimony of various witnesses. The photos of the defendant or Ms. Jefferson posing with guns and large amounts of cash would tend to support the testimony of witnesses who said the defendants were engaged in the

-19-

business of drug trafficking.  As the Government points out, three of the photos corroborated Tony Tanniehill's testimony describing a specific firearm that he said the defendant carried while distributing crack.  Other photos served to corroborate the testimony of witnesses who identified the defendant's associates during this time.  In sum, the photos were relevant because they had a tendency to make more probable the existence of facts that were of consequence in the trial.  See Fed.R.Evid. 401.  Even if we were to conclude otherwise, however, the trial court's decision to admit these photos could not constitute a basis for reversal of the convictions.  Given the plethora of cash, firearms and drugs in the defendant's possession on the date of his arrest –all of which were properly admitted into evidence before the jury– any error in the admission of a few photographs showing the defendant and his friends holding guns and cash was undoubtedly harmless.  See Fed.R.Crim.P. 52(a) (any error which does not affect substantial rights shall be disregarded).

## VI.

The judgment of the district court is AFFIRMED.