**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**November 20, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

    v.

JOSE CASTRO-RIVAS,

    Defendant - Appellant.

No. 06-4086 & 06-4140

D. Utah

(D.C. No. 2:05-CR-231-TC)

---

**ORDER AND JUDGMENT**[*]

---

Before **O'BRIEN**, **McWILLIAMS**, and **GORSUCH**, Circuit Judges.

---

Jose Castro-Rivas entered a conditional plea of guilty to conspiracy to distribute fifty grams or more of pure methamphetamine in violation of 21 U.S.C. §§ 841 & 846. He appeals from the district court's denial of his motion to suppress evidence, claiming the officers lacked probable cause to effect his arrest. On cross-appeal, the government challenges the reasonableness of the district

---

[*]This order and judgment is not binding precedent except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

court's sentence, alleging it erroneously imposed a downward variance[1] based solely on the fact Castro-Rivas would be deported after his imprisonment. Exercising jurisdiction pursuant to 28 U.S.C. § 1291 & 18 U.S.C. § 3742, we affirm the district court's denial of Castro-Rivas' motion to suppress, but reverse and remand for resentencing.

## I. BACKGROUND

The undisputed facts are recounted from the district court's order. (Appellant's Appx. at 18-23.) On March 16, 2005, Officer Jeffrey Plank of the Utah County Major Crimes Task Force received a telephone call from State Trooper Sheets. Sheets informed Plank he had just stopped a vehicle and arrested two people for narcotics possession. Sheets asked Plank to come to the Juab County jail where the individuals were being held. Upon Plank's arrival, he spoke with one of the individuals (the informant) regarding the drugs and money that had been found in the vehicle. The informant said he received the money and drugs through his work as a street dealer for Jose Castro-Rivas and had first-hand knowledge of the operation. The informant told Plank that Castro-Rivas had two apartments in the Salt Lake City, Utah, area used to stash drugs and money. One

---

[1] A variance occurs "when a court enhances or detracts from the recommended [Guidelines] range through application of § 3553(a) factors." *United States v. Atencio*, 476 F.3d 1099, 1101 n.1 (10th Cir. 2007). A departure occurs "when a court reaches a sentence above or below the recommended Guidelines range through application of Chapters Four or Five of the Sentencing Guidelines." *Id.*

-2-

of the apartments was also used for a place for the runners to sleep. The informant identified one of the runners as "Abby." He told Plank that Castro-Rivas would be returning from Los Angeles that evening with three kilograms of heroin and three kilograms of cocaine held in a hidden compartment in "a maroon or red colored police type vehicle with round circular taillights." (R. Supp. App. at 19) (quotations omitted).) The informant stated he was providing this information to receive consideration of leniency for the drug charges which would result from his arrest. Plank told him, to receive leniency, the informant would have to cooperate fully, show them where the apartments were and make some telephone calls. The informant agreed.

Plank and the informant then left the jail and met with other officers at the Task Force Office in Orem, Utah, where Plank gave a short briefing. Following the briefing, Plank, the informant, and Officer Leany followed the informant's directions to an apartment complex. The informant pointed out a particular apartment and stated it was the runners' apartment. He stated when Castro-Rivas returned, this was the place which would be used to break down the larger amounts of drugs into distributable quantities. The informant identified a vehicle parked outside the apartment as belonging to Abby. A registration check confirmed the owner was Abisael Jimenez-Garcia.

The informant then led the officers to another apartment complex and again pointed to a specific apartment. He stated this was Castro-Rivas' residence and

was also used to store drugs. Outside the building, approximately thirty to forty yards away, the informant pointed to a white vehicle belonging to Castro-Rivas. Registration records confirmed this statement.

At this point, the officers asked the informant to make a telephone call to Castro-Rivas. He complied. The call was tape recorded and it appeared Castro-Rivas was angry with the informant and was worried about where the informant had been. Castro-Rivas told the informant to call Abby to resolve the conflict. The informant called Abby, again while being recorded, and the telephone was answered by Rosendo Castro-Rivas, Jose's brother. Rosendo told the informant to come to the apartment; Jose would be there in a few hours and they could resolve the problems.

The officers set up surveillance at the runners' apartment. While waiting for Castro-Rivas' return, two men identified by the informant as Rosendo and Abby went in and out of the apartment several times; at one point Abby left in his car. An immigration check was also run on Castro-Rivas which indicated he was an "overstay," an immigrant who remains in the country illegally after his visa has expired.[2] In the meantime, the officers arranged to have a canine at the location when Castro-Rivas returned.

At approximately 11:30 that night, the vehicle described by the informant

---

[2] Castro-Rivas' visitor's visa was issued on October 20, 1988. It was valid for six months.

entered the parking lot. As it entered, the informant said, "That's the car. That's him." The officers surrounded the vehicle with guns drawn shouting "Police." Castro-Rivas eventually got out of the car and laid on the ground. He was handcuffed and the officers put away their weapons. An officer frisked Castro-Rivas and confirmed his identity. The canine was brought to the car and eventually scratched at the area by the trunk latch. Further investigation revealed a concealed compartment cut into the bumper containing kilogram bundles of narcotics.

Minutes after Castro-Rivas was seized, several of the officers approached the runners' apartment to do a "knock and talk." Rosendo answered the door and gave the officers permission to enter. Rosendo told them someone else was in the apartment and went to the bedroom to get Abisael. After Abisael gave consent to search the apartment, the officers uncovered over two ounces of heroin, two ounces of cocaine, drug paraphernalia and drug packaging materials. The next day, after obtaining a warrant, officers searched the second apartment. They found a total of 961 grams of methamphetamine, 49 grams of cocaine and 277 grams of heroin as well as paraphernalia, packaging materials and two stolen handguns.

On April 13, 2005, Castro-Rivas, his brother Rosendo and others were indicted in an eight count indictment charging, *inter alia*, distribution of methamphetamine and cocaine, possession with intent to distribute cocaine,

methamphetamine and heroin, possession of a firearm by an illegal alien, and illegal reentry by a deported alien. Subsequently, on December 27, 2005, Castro-Rivas and Rosendo were charged in a one count information charging conspiracy to distribute methamphetamine. Castro-Rivas pled guilty plea to the conspiracy charge pursuant to a plea agreement, reserving his right to challenge the denial of his motion to suppress evidence.

The presentence report calculated Castro-Rivas' total offense level as 37, which included a two point upward adjustment for his role in the offense, and a Criminal History Category of I. *See* USSG §3B.1.1(C). The resulting guideline range, based on the 2005 Sentencing Guidelines Manual, was 210-262 months imprisonment. The statutory maximum sentence was life imprisonment and the minimum sentence was 120 months. *See* 21 U.S.C. § 841(b)(1)(A).

At the sentencing hearing, Castro-Rivas successfully argued the evidence was insufficient to demonstrate he was an organizer or leader of the operation, thereby reducing his offense level to 35 and, in turn, the guideline sentencing range to 168-210 months imprisonment. However, the district court indicated it was contemplating imposing a lesser sentence, stating, "Mr. Castro Rivas is subject to deportation. I'm thinking -- and I'll want to hear you both on it. I'm thinking very hard of just giving him the 10 years, which I would be required to do. Any way you look at it, that's a very long time. And then let him be deported." (R. Supp. Appx. at 110.) After argument from counsel and a

statement by Castro-Rivas, the district court concluded:

> [I]'m going to find he was not an organizer. . . . So what I'm looking at under 3553 is the nature and circumstances of the offense and history and characteristics of the defendant. There was a lot of drugs involved. . . . There was a lot of planning. There were weapons involved. There were secret compartments. . . . There were other apartments used.
>
> And I think that the crime is very serious, and I want to make sure that my sentence promotes respect for the law. I also have to make sure that there's adequate deterrence, and what I believe that means is make sure that there is an example sent, and make sure that Mr. Castro Rivas is deterred from committing the same offense.
>
> And that is where . . . I think the fact of deportation figures in. Not that he gets a break for being illegally here, but because he is going to be removed to another country when he is released. And that plays some role in the deterrent factor. That also protects the public, figures in on the protection of the public from further crimes.
>
> I think that a sentence of 10 years will provide Mr. Castro Rivas with whatever training he is able to receive. And, therefore, for all of those reasons, taking into account 120 months is a very long time, balance that against the seriousness of the crime, the fact that the public at least here will be protected because he is going to be deported, I do impose a sentence of 120 months.

(R. Supp. Appx. at 117-19.)

Castro-Rivas timely filed his appeal challenging the denial of his motion to suppress evidence. In turn, the government filed a cross-appeal challenging the variance from the guideline range.

## II. DISCUSSION

A. <u>Motion to Suppress</u>

Castro-Rivas argues the police lacked probable cause to arrest him without

a warrant and all evidence resulting therefrom should be suppressed as the fruits of the unlawful arrest. He asserts there is no probable cause when police rely solely on the statements of an unknown and unproven informant whose self-serving allegations are not sufficiently corroborated by other evidence.

"When reviewing a district court's denial of a motion to suppress, we accept the district court's factual findings unless they are clearly erroneous and view the evidence in the light most favorable to the government." *United States v. Traxler,* 477 F.3d 1243, 1246 (10th Cir.), *cert. denied*, 2007 WL 2030503 (2007). Even so, we review de novo Fourth Amendment reasonableness including the district court's determination of probable cause. *Id.*

"To be reasonable under the Fourth Amendment, an arrest must be supported by probable cause." *Id.* "The . . . standard of probable cause protects citizens from rash and unreasonable interferences with privacy and from unfounded charges of crime, while giving fair leeway for enforcing the law in the community's protection. *Maryland v. Pringle*, 540 U.S. 366, 370 (2003) (internal quotations omitted). Reduced to its essence, "probable cause is a reasonable ground for belief of guilt." *Id.* at 371. It "exists when under the totality of the circumstances there is a reasonable probability that a crime is being committed." *Traxler*, 477 F.3d at 1247.

Castro-Rivas bases his argument on two propositions. First, he maintains *Lilly v. Virginia* requires a court to apply a presumption of unreliability to the

uncorroborated statements of a criminal cohort implicating the defendant as the primary wrongdoer. 527 U.S. 116 (1999). Second, because the statements are presumptively unreliable, he contends corroborating evidence of benign facts is insufficient to establish probable cause; the police must have corroborating evidence of the actual criminal activity.

Ben Lilly, his brother Mark, and a friend were arrested for a two-day crime spree during which they killed one victim. During police questioning, Mark admitted to certain crimes but stated Ben and their friend had stolen the guns and Ben had actually shot the victim. *Id.* at 120-21. At Ben's trial, Mark invoked his Fifth Amendment rights and did not testify. The district court then admitted Mark's statements describing Ben as the leader and shooter. *Id.* at 122. The plurality opinion concluded the admission of Mark's custodial statement, untested by cross-examination, violated the Confrontation Clause. It noted the Court had "over the years spoken with one voice in declaring presumptively unreliable accomplices' confessions that incriminate defendants." *Id.* at 131 (quotations omitted). This presumption is applied because "the truthfinding function of the Confrontation Clause is uniquely threatened when an accomplice's confession is sought to be introduced against a criminal defendant [at trial] without the benefit of cross-examination." *Id.* at 132.

Castro-Rivas recognizes *Lilly* spoke only in the context of the Confrontation Clause. Nonetheless, he argues if the statements of an accomplice

-9-

are presumptively unreliable in one context, they must be presumptively unreliable in another. He therefore concludes the standard in *Lilly* must be grafted on to Fourth Amendment guarantees. He errs.

The Supreme Court has repeatedly distinguished the concept of probable cause from constitutional trial protections such as the defendant's right to confront the witnesses against him. For example, in *Gerstein v. Pugh*, the Court stated:

> The use of an informal procedure [to determine probable cause] is justified not only by the lesser consequences of a probable cause determination but also by the nature of the determination itself. It does not require the fine resolution of conflicting evidence that a reasonable-doubt or even a preponderance standard demands, and credibility determinations are seldom crucial in deciding whether the evidence supports a reasonable belief in guilt. This is not to say that confrontation and cross-examination might not enhance the reliability of probable cause determinations in some cases. In most cases, however, their value would be too slight to justify holding, as a matter of constitutional principle, that these formalities and safeguards designed for trial must also be employed in making the Fourth Amendment determination of probable cause.

420 U.S. 103, 121-22 (1975) (citation and footnote omitted); *see also Ornelas v. United States*, 517 U.S. 690, 696 (1996) (stating probable cause is not a "finely-tuned standard[], comparable to the standards of proof beyond a reasonable doubt or of proof by a preponderance of the evidence") (quotations omitted); *Illinois v. Gates*, 462 U.S. 213, 235 (1983) ("Finely-tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence, useful in formal trials, have no place in the magistrate's decision. . . . While an

-10-

effort to fix some general, numerically precise degree of certainty corresponding

to probable cause may not be helpful, it is clear that only the probability, and not

a prima facie showing, of criminal activity is the standard of probable cause.")

(internal quotations omitted).

The common-sense, flexible approach used to determine the existence of

probable cause cannot be compared to the demanding standards of the

Confrontation Clause.  As the Court noted in *Crawford v. Washington*:

> [T]he [Confrontation] Clause's ultimate goal is to ensure reliability
> of evidence, but it is a procedural rather than a substantive guarantee.
> It commands, not that evidence be reliable, but that reliability be
> assessed in a particular manner: by testing in the crucible of
> cross-examination.  The Clause thus reflects a judgment, not only
> about the desirability of reliable evidence (a point on which there
> could be little dissent), but about how reliability can best be
> determined.

541 U.S. 36, 61 (2004).  Moreover, Castro-Rivas' insistence that a statement's

unreliability for one purpose must translate to all purposes for which it may be

used is not supported by case law or common sense.  The reliability of

information necessary to convict a defendant of a crime is not the same caliber as

the determination of probable cause to arrest.  As the Court recognized in *Gates*,

"[i]nformants' tips, like all other clues and evidence coming to a policeman on

the scene may vary greatly in their value and reliability.  Rigid legal rules are

ill-suited to an area of such diversity."  462 U.S. at 232 (quotations omitted).

Consequently, we decline Castro-Rivas' invitation to import rigid legal rules

applied in the trial context to the determination of probable cause and, instead, we

-11-

apply the totality of the circumstances test espoused by the Court. *Id.* at 238.

In doing so, we decline to adopt Castro-Rivas' second proposition – the corroboration must be of incriminating facts, not simply benign information. While it is true a "tip must have some indicia of reliability in its assertion of illegal activity, not just in its tendency to describe or identify a specific person," reliability is not necessarily measured by direct evidence of criminal activity. *United States v. Jenkins*, 313 F.3d 549, 554 (10th Cir. 2002). The key is whether, among other corroborated facts, an informant's predictive information relating to criminal activity is independently confirmed. *See United States v. Hauk*, 412 F.3d 1179, 1188 (10th Cir. 2005) ("By corroborating predictive information in an anonymous tip, police officers test the informant's knowledge and credibility, getting some assurance that the tip is reliable.") (quotations omitted). Indeed, "[w]hen there is sufficient independent corroboration of an informant's information, there is no need to establish the veracity of the informant." *United States v. Danhauer*, 229 F.3d 1002, 1006 (10th Cir. 2000).

Turning to the district court's determination that the totality of the circumstances supported an objective belief that "there [was] a fair probability that contraband or evidence of a crime [would] be found" in the vehicle driven by Castro-Rivas, we agree. *Gates*, 462 U.S. at 238. First, the identity of the informant was known to the officers who could then "hold him responsible if his allegations turned out to be fabricated." *Jenkins*, 313 F.3d at 554; *see also United*

-12-

*States v. Brown*, 496 F.3d 1070, 1076 (10th Cir. 2007) (discussing reliability and recognizing when an informant makes his identity readily known, he is "not free to lie with impunity," because he risks criminal liability for reporting a false claim) (quotations omitted). "This provides a disincentive for making false allegations [which the] court can consider . . . in weighing the reliability of the tip." *Jenkins* at 554 (quotations omitted). "Another relevant factor is that the informant claimed to have personally witnessed the defendant's drug transactions and provided a detailed description of how those transactions were carried out." *Id*. at 554-55.

Moreover, the informant not only implicated Castro-Rivas, but also admitted to his own criminal activity beyond his culpability for the drug amounts found at his arrest. He admitted he was a street-level dealer and the money in his possession was from the sale of drugs. Courts have consistently determined an informant's further incriminating statements against his own penal interest add to reliability. *See United States v. Harris,* 403 U.S. 573, 583 (1971) ("Admissions of crime, like admissions against proprietary interests, carry their own indicia of credibility -- sufficient at least to support a finding of probable cause to search."); *see also Jenkins*, 313 F.3d at 555 (noting "the informant admitted to having assisted the defendant in preparing drugs for distribution"); *United States v. Leppert*, 408 F.3d 1039, 1042 (8th Cir. 2005) ("We reject Mr. Leppert's contention that the harm to [the informant's] own penal interests does not enhance

-13-

his credibility because he incriminated others."); *United States v. Patayan Soriano*, 361 F.3d 494, 505 (9th Cir. 2004) (stating the informant's "statements amounted to admissions of criminal activity and could be deemed reliable on that basis").

Finally, the predictive information provided by the informant was sufficiently corroborated. Following the informant's identification of the two stash houses, the officers verified two of the co-conspirators named by the informant were connected to those locations through vehicle registrations. The calls made to Castro-Rivas and his brother Rosendo corroborated the informant's information regarding Castro-Rivas' travel plans. In addition, when Castro-Rivas arrived at the predicted time, he was driving the car described by the informant.

Relying primarily on *Danhauer*, Castro-Rivas argues the circumstances did not sufficiently corroborate the informant's allegations because the officers did not independently corroborate the identity of the persons residing in the apartments or whether the suspects had criminal records. Castro-Rivas' attempt to compare the facts of this case to those in *Danhauer* are unpersuasive. In *Danhauer*, we determined the officer did not have probable cause to search a residence, even though the affidavit supporting probable cause contained statements regarding the physical description of the Danhauer residence, the identity of the occupants and their criminal histories, as well as the fact one of the occupants had failed a drug test the day before. We determined these facts were

-14-

insufficient because the "affidavit [did] not reveal . . . the informant's basis of knowledge or adequately verify the informant's most serious allegation, that the Danhauers were manufacturing methamphetamine." *Danhauer*, 229 F.3d at 1006. We concluded "[t]he only possible nexus between Danhauer's residence and the alleged criminal activity was his wife's urinalysis result. This is not the type of evidence that enables the state magistrate to draw a reasonable inference that the items subject to the search warrant would be located at Danhauer's residence." *Id*.

Unlike *Danhauer*, the officers in this case clearly knew the first-hand basis of the informant's knowledge; he had personally been in the apartment and had assisted in preparing drugs for distribution at that location. Further, the officers corroborated not only the presence of the co-conspirators at the residences, but also the predicted time of Castro-Rivas' arrival and the description of the vehicle he would be using to transport the drugs. As the Court stated in *Alabama v. White*:

> The fact that the officers found a car precisely matching the caller's description in front of the 235 building is an example of [conditions existing at the time of the tip]. Anyone could have "predicted" that fact because it was a condition presumably existing at the time of the call. What was important was the caller's ability to predict respondent's *future behavior,* because it demonstrated inside information-a special familiarity with respondent's affairs. The general public would have had no way of knowing that respondent would shortly leave the building, get in the described car, and drive the most direct route to Dobey's Motel. Because only a small number of people are generally privy to an individual's itinerary, it is reasonable for police to believe that a person with access to such

-15-

> information is likely to also have access to reliable information about that individual's illegal activities.

496 U.S. 325, 332 (1990). Had the officers only established the presence of a car registered to Castro-Rivas at a certain location, there would be insufficient corroboration. But here, there was much more. Given the informant's first-hand knowledge and the officers' corroboration of both existing and predictive information, we conclude the officers could reasonably believe, in light of the facts and circumstances within their knowledge at the time of the arrest,[3] that Castro-Rivas had committed or was committing an offense.

B. <u>Reasonableness of Sentence</u>

On cross-appeal, the government maintains the district court erred in imposing a minimum statutory 120-month sentence as opposed to a sentence within the guideline range, 168-210 months imprisonment, based on Castro-Rivas' deportation status. In response, Castro-Rivas argues the sentence is reasonable because his deportation status was only one factor and his sentence must be considered in light of the fact that this was his first conviction.

In cases following *United States v. Booker*, 543 U.S. 220 (2005), the district court's sentencing determination is reviewed under a reasonableness standard, guided by the statutory factors delineated in 18 U.S.C. § 3553(a). *See*

---

[3] Given our resolution of this issue, we need not address the government's related argument that only reasonable suspicion was necessary when Castro-Rivas was detained.

*United States v. Kristl,* 437 F.3d 1050, 1053 (10th Cir. 2006). Reasonableness review has both "procedural and substantive components" encompassing "the reasonableness of the length of the sentence, as well as the *method* by which the sentence was calculated." *United States v. Hildreth,* 485 F.3d 1120, 1127 (10th Cir. 2007) (quotations omitted). "To impose a procedurally reasonable sentence, a district court must calculate the proper advisory Guidelines range and apply the factors set forth in § 3553(a)." *Id.* (quotations omitted). "A substantively reasonable sentence ultimately reflects the gravity of the crime and the § 3553(a) factors as applied to the case." *Id.*

The government argues the district court's sentence is procedurally unreasonable because its reliance on the fact Castro-Rivas is a deportable alien is an erroneous application of the § 3553(a) factors as a matter of law. We agree. While we have not had an opportunity to address the applicability of deportation to the statutory sentencing factors post-*Booker*, we are guided by our precedent and the Second Circuit's analysis in *United States v. Will*, 476 F.3d 103 (2d Cir. 2007).

In *United States v. Mendoza-Lopez*, a pre-*Booker* case, we addressed the propriety of departure based on the "unduly harsh consequences of imprisonment for deportable aliens." 7 F.3d 1483, 1487 (10th Cir. 1993). We rejected a departure from the guidelines range on this basis, adopting the Second Circuit's reasoning in *United States v. Restrepo,* 999 F.2d 640 (2d Cir.1993). *Id.* The

-17-

*Restrepo* court did not altogether bar a departure based on deportation, but stated, "to the extent that alienage is a characteristic shared by a large number of persons subject to the Guidelines, it is a characteristic that, for sentencing purposes, is not 'ordinarily relevant.' It remains, however, a characteristic that may be considered if a sentencing court finds that its effect is beyond the ordinary." *Id.* at 644; *see also United States v. Alvarez-Cardenas*, 902 F.2d 734, 737 (9th Cir. 1990) ("[D]eparture for deportation reasons would be inappropriate. The possibility of deportation does not speak to the offense in question, nor does it speak to the offender's character. It is quite unlike the specific considerations listed in U.S.S.G. § 5K2. On the other hand, deportation is quite similar to the factors set forth in U.S.S.G. § 5H1, which are considered inappropriate grounds for departure in most instances.").

More recently, the Second Circuit has again spoken to the application of deportation as a factor considered under "deterrence" and "protection of the public." *Wills*, 476 F.3d at 107-09. There, the sentencing judge explained he "deemed deportation relevant under § 3553(a)(2)(C), which requires a court to consider 'the need for the sentence imposed . . . to protect the public from further crimes of the defendant.'" *Id.* at 107. The court reaffirmed its holding in *Restrepo* and then addressed public protection under § 3553(a)(2)(C). First, the court noted that even assuming the public to be protected is "only the American public, . . . criminal conduct committed abroad is capable of harming Americans."

-18-

*Id*. at 107-108 (citation omitted). In addition, it recognized, "[t]here is also a risk of illegal reentry, which, if realized, would further undermine protection of the public in this country." *Id*. at 108. The court further reasoned:

> [A] sentencing scheme in which future deportation may lead to diminished sentences would weaken the deterrent effect of punishment. Some potential criminals may consider deportation preferable to imprisonment and would therefore not be as deterred from committing future crimes if they thought they would be deported rather than serve all or part of what should be their appropriate prison term. The potential increase in crimes due to a decrease in deterrence would detract from the Congressional goal of protecting the public.

*Id*. at 108 (citation omitted). Turning to Congressional intent as interpreted in *Booker*, the court determined, "treating the mere application of immigration law as the basis for a non-Guidelines sentence [] flouts the goal of individualized justice by improperly, and automatically, grouping a large percentage of defendants together to receive the same general sentencing treatment even in the absence of a Congressional directive to treat this group differently from others." *Id*. As a result of these factors, the court concluded, "[b]ecause deportation may not be viewed as additional punishment and the district court noted only the bare fact of deportation in its statement of reasons, the district court erred as a matter of law in factoring into Wills' sentence his likely deportation after serving his prison term." *Id*. at 109.

We find the Second Circuit's reasoning sound. In *United States v. Garcia-Lara*, we reiterated a non-guidelines sentence must be justified by "particular

-19-

characteristics of the defendant that are sufficiently uncommon." 499 F.3d 1133, 1140 (10th Cir. 2007) (quotations omitted). "As our case law makes clear, a sentencing court may not accord ordinary facts extraordinary weight." Id.; *see also Hildreth,* 485 F.3d at 1129-30 (holding that sentence was unreasonable because the court did not distinguish the defendant or his offense "from the ordinary defendant upon which the Guidelines sentence is calculated").

In light of the continued resonance of the guidelines as part and parcel of the statutory analysis and its rejection of non-guideline sentences based on status rather than individualized considerations, *see* USSG §§5H1.1-1.6 & 5H1.10-12, we again adopt the sound reasoning of the Second Circuit. *See Wills*, 476 F.3d 109 ("[A] non-Guidelines sentence that rests primarily upon factors that are not unique or personal to a particular defendant, but instead reflects attributes common to all defendants should . . . be viewed as inherently suspect.") (quotations omitted); *see also Alvarez-Cardenas*, 902 F.2d at 737 ("A defendant's crime is no less serious, nor is his history of past actions changed because he may be subjected to deportation proceedings at some point in the future. In addition, were we to find that merely being an alien who is subject to possible deportation should affect a sentencing decision, we would be treating aliens differently simply because they are not citizens of this country. We decline to support such an interpretation of the Guidelines."). Because the district court made no individualized determination but applied the factor of future deportation

generically, the court procedurally erred as a matter of law.

The district court's denial of Castro-Rivas' motion to suppress is

**AFFIRMED** and the case is **REMANDED** for resentencing consistent with this

Order and Judgment.

ENTERED FOR THE COURT


Terrence L. O'Brien
Circuit Judge