**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**April 8, 2025**

**Christopher M. Wolpert**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

DEREK RAY FLAMING,

    Defendant - Appellant.

No. 23-5064

_____

**Appeal from the United States District Court**
**for the Northern District of Oklahoma**
**(D.C. No. 4:21-CR-00281-GKF-1)**

_____

Neil D. Van Dalsem, Assistant Federal Public Defender (Scott A. Graham, Federal Public Defender, with him on the briefs), Office of the Federal Public Defender, Northern & Eastern Districts of Oklahoma, Muskogee, Oklahoma, for Defendant-Appellant.

Michael A. Rotker, Attorney, United States Department of Justice, Appellate Section, Washington, D.C. (Nicole M. Argentieri, Acting Assistant Attorney General, Lisa H. Miller, Deputy Assistant Attorney General, and Ralph Paradiso, Trial Attorney, United States Department of Justice, Criminal Division, Washington, D.C.; and Clinton J. Johnson, United States Attorney, and Aaron M. Jolly, Assistant United States Attorney, Northern District of Oklahoma, Tulsa, Oklahoma), for Plaintiff-Appellee.

_____

Before **MATHESON**, **EID**, and **ROSSMAN**, Circuit Judges.

_____

**EID**, Circuit Judge.

_____

Derek Flaming showed his minor stepdaughter child pornography, sexually assaulted her, and attempted to obtain oral sex from her.  Following a jury trial, Flaming was convicted of distribution and receipt of an obscene visual representation of sexual abuse of children, aggravated sexual abuse, and attempt to cause a minor to engage in a sexual act by placing her in fear.  Flaming now appeals.

On appeal, Flaming challenges the sufficiency of the evidence and the district court's evidentiary rulings.  In the end, Flaming fails to show any error underlying his trial or conviction.

We reject Flaming's three sufficiency-of-the-evidence arguments.  First, we hold that the government's evidence, which included a contemporaneous U.S. Department of Defense online record of Flaming (a member of the military and later, at the relevant time, a military dependent) showing only that Flaming held United States citizenship and evidence that South Korean authorities declined to prosecute Flaming for his crimes in South Korea due to his United States citizenship, viewed in the light most favorable to the government, supported the jury's finding that Flaming was not a South Korean national at the time of the charged conduct.  Second, we hold that there was sufficient evidence that Flaming received images of child pornography:  It sufficed that the government established that images of child pornography were downloaded on a computer that sat in the apartment where Flaming lived with his wife and children, to which Flaming had access, and on which child pornographic images were sent from Flaming's personal Skype account, all in light of evidence that Flaming had shown his minor stepdaughter child pornography

2

before.  Lastly, we hold that there was sufficient evidence that Flaming placed his minor stepdaughter in fear when Flaming instructed his stepdaughter to "get him off" while he was naked, and he had sexually abused her in the past.

We also reject Flaming's two evidentiary points of error.  First, the district court did not violate Flaming's Confrontation Clause rights or violate the Federal Rules of Evidence in limiting Flaming's cross-examination of his minor stepdaughter on her purported prior statements that Flaming had not sexually abused her in South Korea.  On confrontation, the district court did not deprive Flaming of an opportunity to cross-examine his stepdaughter on those prior statements; Flaming failed to comply with the court's reasonable limit on this line of cross-examination that he first establish that she actually made any such statements.  Similarly, the district court did not abuse its discretion in concluding that Flaming had not laid the proper foundation to impeach his stepdaughter with prior inconsistent statements, because the court did not clearly err in finding that Flaming's stepdaughter never made a prior inconsistent statement to begin with.  Finally, the district court did not abuse its discretion by permitting the government to introduce summaries of electronically stored information, because the underlying information was admissible and voluminous, and the summary accurately portrayed the underlying information.

For these reasons, expounded upon below, we affirm.

## I.

Derek Ray Flaming lived in Aurora, Colorado with his wife, biological daughter, and minor stepdaughter ("Jane Doe").  Later, the family lived in South

3

Korea while Flaming and his wife each served in the army there.

On the night of November 18, 2016, while Flaming's wife worked at an army base, Flaming was at their apartment in South Korea with Jane Doe. Flaming, who was drunk, sent Skype messages to his wife requesting sexual favors. His wife responded that she would be back home tomorrow. But that was not good enough for Flaming. He replied that if she did not come home immediately, he would instead make sexual advances at his stepdaughter, Doe. *See, e.g.*, Supp. R. at 131 ("SO [Doe] GOING TO GET F[*****]."). His wife then begged Flaming repeatedly, "[n]o [don't] do anything to her." *Id.* Flaming responded that "YOU NEED TO DO IT . . . OR I WILL DO HER." *Id.*

Over the next hour, Flaming continued the tone of the conversation—making graphic and disturbing statements to his wife, even threatening to commit "HARD CORE" sex acts on Doe like "RAPE." *Id.* at 138 ("I'M GOING TO RAPE HER . . . . I RAPE HER NOW.").

At some point during the night, Doe left the house. In tears, Doe went to a neighbor asking for help. Doe told the neighbor that her stepfather said that she had to "get him off." R. Vol. II at 274. The neighbor later testified that Doe "said her stepdad t[old] her to give him . . . a blowjob or get out from the house." *Id.* at 300. Apparently, this was not the first time something like this happened. Doe told the neighbor that it "happened a lot." *Id.*

In response to these allegations, the neighbor decided to take Doe to a police station. The police later contacted the Army Criminal Investigation Division

("CID"), and the CID thereafter opened a formal criminal investigation into Doe's allegations.

Further investigation revealed that Flaming had previously abused Doe and shown her pornographic images. In several interviews by CID investigators, Doe stated that she had been abused by Flaming in Colorado and once before in South Korea.

Doe told the CID that, when she was in "third grade" in Colorado, Flaming showed her sexually explicit images of two adults having sex to teach her "how babies are made." *Id.* at 277. And Flaming did not just show her adult content. Doe also recounted that Flaming showed her a second image that involved "two younger children, one giving the other oral sex." *Id.* at 276.

After showing Doe this pornographic content, Flaming told her that she "would have to do that . . . in Korea" and asked her if she "wanted to practice with him." *Id.* at 277. Doe initially refused. But because Flaming "kept asking" her and even offered to pay her for oral sex, she eventually "gave in and [] said yes." *Id.*

Doe testified as to another incident in Colorado. Doe testified that Flaming "went into [her] bed and . . . grabbed [her] chest, [] kissed [her], . . . went on top of [her], [] licked [her] vagina, . . . had [her] put his penis in [her] mouth, and [] tried to penetrate [her] vagina." *Id.* at 277–78.

Doe also described an incident that happened in South Korea a few months before the November 18 incident. Flaming, while drunk, "got on top of [her] and tried to get [her] to suck his penis and he tried to force his penis into [her] mouth,"

5

but she refused. *Id.* at 275–76. Flaming continued to try and force Doe, prompting her to scream, at which point Flaming "choked [her] up against a wall." *Id.* at 276.

The CID also interviewed Flaming. Flaming indicated that he was an American citizen. *Id.* at 59. On the night of the November 18 incident, Flaming said that he had been drinking and, when he went to the bathroom, he accidentally urinated on his shorts, so he took them off and got naked. And while naked, he stated that he went into the living room and yelled at Doe because she was too loud.

As part of the investigation, CID agents executed search warrants at Flaming's apartment. They seized a Lenovo desktop computer, which upon examination, contained images of Flaming's Colorado driver's license and a military rations card issued to him. Investigators also discovered that the computer had a "Tor browser" downloaded, which allows users to stay anonymous and is often used by "people engaged in criminal conduct." *Id.* at 173–75. Also on the computer were several peer-to-peer filesharing applications commonly used "in the world of child exploitation . . . since the 2005 time period." *Id.* at 173.

The computer's browsing history indicated that searches had been performed and files had been downloaded using terms regularly associated with child pornography. *Id.* at 180 (finding the acronym "PTHC," which "generally stands for preteen hard-core"), *id.* at 181 (finding the term "hussyfan," which refers to a fan of "a prepubescent minor female who doesn't have genital hair"); *id.* at 185 (finding the term "Lolita," which "is a general term for a young girl who is sexually active or sexually promiscuous"); *id.* (finding the terms "11yo, 12yo, small," which "clearly

6

are related to children" and "to terms associated with child pornography"); *id.* at 209–10, 233–38, 249, 267 (finding images and files sent from Flaming's personal Skype account to his wife's account with the name "Siberian Mouse," which is a series of pre-pubescent child pornography).

Investigators issued search warrants to Microsoft regarding the Flamings' Skype accounts that they used to communicate to each other. Although Flaming's account had been "wiped empty," Microsoft produced "more complete and more robust" chats from his wife's account. *Id.* at 247. Those chats revealed the extent of the threats Flaming made to his wife about Doe the night of November 18.

And in the days after, chats sent from Flaming's account, under the username "derek.r.flaming," revealed that Flaming instructed his wife to get Doe to retract her statements to law enforcement. Supp. R. at 146 ("SHE NEED TO TRTRACKTED [sic] HER STAMENT [sic] SAYING SHE LIED"). Chats also showed that Flaming told his wife to "delet[e] all [of their] skype" chat history. *Id.* at 174.

In early 2017, Flaming left South Korea and returned home to Colorado. Later on, he moved to Oklahoma, where he was arrested and then indicted by a federal grand jury. *See also* 18 U.S.C. § 3238 (stating that the venue for crimes committed outside the United States is proper in the district of arrest). A second superseding indictment charged Flaming with committing the five aforementioned crimes in South Korea pursuant to the Military Extraterritorial Jurisdiction Act of 2000 ("MEJA").

7

A jury convicted Flaming of distribution and receipt of an obscene visual representation of sexual abuse of children, in violation of 18 U.S.C. § 1466A(a)(1), aggravated sexual abuse, in violation of 18 U.S.C. § 2241, and attempting to cause a minor to engage in a sexual act by placing her in fear, in violation of 18 U.S.C. § 2242(1). Altogether, the district court sentenced him to two concurrent terms of life imprisonment as well as a concurrent 240 months' imprisonment. Flaming timely appealed, raising three sufficiency-of-the-evidence arguments and challenging two adverse evidentiary rulings.

## II.

We start with Flaming's three sufficiency-of-the-evidence challenges. Flaming argues that (A) the district court plainly erred by entering the judgment of conviction because the government did not meet its burden in proving that Flaming was not a South Korean national; (B) the jury lacked sufficient evidence that Flaming received images of child pornography; and (C) the jury lacked sufficient evidence that Flaming attempted to cause a minor to engage in a sexual act by placing her in fear. As we explain, each argument fails.

## A.

To begin, we assess Flaming's claim that the district court committed plain error by submitting the case to the jury and entering a judgment of conviction even though the government did not sufficiently establish an element under the MEJA. Specifically, Flaming contends that the government did not present sufficient evidence to prove that he was not a South Korean national—a showing that we

8

assume without deciding is an element under the MEJA that the government must prove.

Flaming concedes that he did not raise the argument in his motion for judgment of acquittal to the district court that the government failed to prove he was not a South Korean national under the MEJA. Aplt. Br. at 28. Because the argument about the sufficiency of the evidence underlying an element of a crime was not raised below, this Court reviews for plain error. *United States v. Kimler*, 335 F.3d 1132, 1141 (10th Cir. 2003).

To demonstrate plain error, a defendant must show: "(1) error, (2) that is plain, which (3) affects substantial rights, and which (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Mike*, 632 F.3d 686, 691–92 (10th Cir. 2011) (quoting *United States v. Gonzalez-Huerta*, 403 F.3d 727, 732 (10th Cir. 2005) (en banc)).

That said, "a conviction in the absence of sufficient evidence will almost always satisfy all four plain-error requirements." *United States v. Gallegos*, 784 F.3d 1356, 1359 (10th Cir. 2015). For that reason, "our review for plain error in this context differs little from our de novo review of a properly preserved sufficiency claim." *Id.* We view the record "in the light most favorable to the government" and ask whether the evidence and reasonable inferences drawn from it "would allow a reasonable jury to find the defendant guilty beyond a reasonable doubt." *Id.*

The issue Flaming raises on appeal requires us to look at the sufficiency of the evidence to see if the government could initiate suit under the MEJA. Answering

that question will determine whether the United States possesses criminal jurisdiction over Flaming for crimes committed in a foreign country.

The MEJA states in relevant part:

> Whoever engages in conduct outside the United States that would constitute an offense punishable by imprisonment for more than 1 year if the conduct had been engaged in within the special maritime and territorial jurisdiction of the United States . . . while employed by or accompanying the Armed Forces outside the United States . . . shall be punished as provided for that offense.

18 U.S.C. § 3261(a)(1). This section provides for federal criminal jurisdiction over certain persons who are employed by or accompanying the military and who allegedly commit crimes in a foreign country that would be crimes if committed within the United States.

But other sections of the MEJA, 18 U.S.C. § 3267(1) and (2), limit who falls within the United States's criminal jurisdiction by defining the phrases "employed by the Armed Forces outside the United States" and "accompanying the Armed Forces outside the United States," which appear in § 3261(a)(1). Section 3267 provides a specific limitation, stating that for both phrases, a defendant accused of a crime abroad cannot be "a national of or ordinarily resident in the host nation." 18 U.S.C. § 3267(1)(C), (2)(C).

The jury instructions in this case listed this limitation and other MEJA requirements as jurisdictional elements of every offense. *See* R. Vol. I at 150–51. Specifically, the MEJA's application in this case was contingent on the proof that Flaming was (1) a military dependent who (2) resided with a member of the Armed

Forces outside the United States and who (3) was not a national of or ordinarily resident in South Korea. *See id.* The jury found that all three of these requirements, as to each of the offenses submitted, were met. *See id.* at 150–51, 174(a).

The only jurisdictional aspect of the MEJA at issue on this appeal is whether Flaming was "not a national of . . . the host nation" at the time of the offense. 18 U.S.C. § 3267(1)(C), (2)(C); *see id.* § 3261(a)(1). The government acknowledges that it remains "an open legal question" whether the MEJA requires the government to bear the burden in proving the lack of nationality as an *element* of an offense under the MEJA, or instead, whether the MEJA merely allows a defendant to raise his nationality of the host nation as an *affirmative defense* against the MEJA's application. Oral Arg. at 16:15–27. That said, each party agrees that "for purposes of this case the government has assumed that [the MEJA's nationality requirement] is an element." *Id.* at 16:19–25; *see id.* at 12:33–15:00. As such, we analyze Flaming's argument under the assumption that the government must prove that Flaming was "not a national of" his "host nation," leaving the question for another day.[1] 18 U.S.C. § 3267(1)(C), (2)(C).

Though not many cases have addressed how to prove the MEJA's not-a-"host nation"-national-at-time-of-offense jurisdictional element, in at least one case, the

---

[1] We note, however, that if the MEJA looks at "host nation" nationality as an affirmative defense as opposed to an element of an offense, Flaming would have waived the defense altogether. 18 U.S.C. § 3267(1)(C), (2)(C). Below, Flaming did not contest that he was something different than solely a United States citizen. And on appeal, he does not argue that he is in fact a dual citizen of the United States and South Korea.

government has used direct evidence of non-nationality, albeit only circumstantial evidence of non-nationality at the relevant time.[2]  In *United States v. Williams*, the D.C. Circuit answered the nationality question using a questionnaire that the defendant completed nine years before he committed his crime in Germany; in the questionnaire, the defendant "checked the box indicating that he was a U.S. citizen or national by birth" and wrote "NA" on a question about dual citizenship.  836 F.3d 1, 8 (D.C. Cir. 2016).  The *Williams* court held that, "knowing that [the defendant] was not a German national" when he completed the questionnaire, "a juror could rationally infer that he was not one" during the relevant time nine years later.  *Id.*

As in all criminal trials, the jury "may draw reasonable inferences from direct or circumstantial evidence."  *United States v. Atencio*, 435 F.3d 1222, 1232 (10th Cir. 2006) (quoting *United States v. Jones*, 44 F.3d 860, 865 (10th Cir. 1995)).  So long as a jury's inferences "flow from logical and probabilistic reasoning," we will uphold convictions against sufficiency-of-the-evidence challenges like here.  *Id.* (cleaned up).

To prove that Flaming was not a South Korean national at the time of the charged conduct, the government provided four main pieces of circumstantial evidence for the jury to review.[3]

---

[2] Circumstantial evidence is evidence that proves a fact "based on inference," whereas direct evidence is evidence "that, if true, proves a fact without inference or presumption."  *Evidence*, Black's Law Dictionary (12th ed. 2024).

[3] At the outset, we note that the evidence speaks of Flaming's citizenship, whereas the MEJA speaks of "national[ity]."  18 U.S.C. § 3267(1)(C), (2)(C).  And

First, the government provided Exhibit 39, which contained a U.S. Department of Defense ("DoD") Person Search containing Flaming's citizenship.[4]  The jury heard that the DoD Person Search "is a database that is maintained . . . for everybody that has served in the service, regardless of what their discharge was or not."  R. Vol. II at 71.  A DoD Person Search, the jury learned, allows someone to "get [someone's] information" should the need arise "at a later date."[5]  *Id.*

A day after the November 18 incident between Flaming and Doe, a DoD search revealed only that Flaming had United States citizenship.  Nowhere on the

_____

the terms "citizen" and "national," technically speaking, are not totally coterminous.  *Cf.* 8 U.S.C. §§ 1401, 1408 (providing differences between United States citizenship and nationality, as a matter of United States law).  *See generally* Peter J. Spiro, *A New International Law of Citizenship*, 105 Am. J. Int'l L. 694, 695 n.6, 717 & n.150 (2011) (discussing the historical distinction between the terms and the distinction's apparent narrowing in recent times).  *Compare Citizen*, Black's Law Dictionary (7th ed. 1999) ("A person who, by either birth or naturalization, is a member of a political community, owing allegiance to the community and being entitled to enjoy all its civil rights and protections; a member of the civil state, entitled to all its privileges."), *with National*, Black's Law Dictionary (7th ed. 1999) ("A member of a nation. . . . A person owing permanent allegiance to and under the protection of a state.").  For purposes of this case, however, the parties do not at all suggest that any technical distinction between the terms is relevant.  *Cf. Williams*, 836 F.3d at 8 (finding that the defendant's indication that he did not hold "dual citizenship" established that he was "not a German national").  Nor do we.

[4] Flaming argues that the DoD search related only to his wife, not him.  Aplt. Br. at 33.  A review of the document shows that is not the case.  *See* Supp. R. at 36–38.

[5] Flaming contends that nothing in the record indicates the *source* of the DoD's information contained in Exhibit 39.  Aplt. Br. at 33.  That may be true as to the record itself, but either way, the jury heard that the record reflects "a database that is maintained . . . for everybody that has served in the service," R. Vol. II at 71, which the jury could understand to mean that the DoD collects that information either itself or from some reliable source.

DoD Person Search does it say that Flaming had dual citizenship in the United States and South Korea. Viewed in the light most favorable to the government, *see United States v. Sapp*, 53 F.3d 1100, 1103 (10th Cir. 1995), a juror could reason that the DoD Person Search would have had both the United States and South Korea listed if Flaming was in fact a dual citizen. Restated, a rational juror could think that any information about Flaming's supposed South Korean nationality would have appeared in Exhibit 39, the DoD Person Search of someone who both served in the military and then later was a military dependent. Thus, this "maintained" "database" of people having served in the military's "information," R. Vol. II at 71, collected on Flaming within a day of the November 18 incident, supports that he was solely a citizen and national of the United States.

Next, the government provided three items of circumstantial evidence from the CID's investigation. First, Flaming had admitted during his CID interview that he was "an American citizen."[6] *Id.* at 59. Second, CID investigators "had spoken to the Korean police" and found out that "the Korean police [would not] prosecute a crime committed by [Flaming,] a U.S. citizen," because "some of [the alleged criminal

---

[6] Flaming made no mention of South Korean citizenship in the CID interview. Flaming is correct that just because one admits that they are a citizen of one country does not necessarily mean that they are not a citizen of another country. *Cf. Kawakita v. United States*, 343 U.S. 717, 724 (1952) ("The mere fact that [someone] asserts the rights of one citizenship does not without more mean that he renounces the other."). But here, the government provided the jury with more evidence than just Flaming's assertion of his United States citizenship in the CID interview. And collectively, the circumstantial evidence, viewed in the light most favorable to the government, supports the jury's finding.

14

conduct] occurred in Colorado." *Id.* at 78–79.  The "logical and probabilistic"

inference most favorable to the government here, *see Atencio*, 435 F.3d at 1232, is

that the South Korean police declined to prosecute Flaming because he was not a

South Korean national.  Third, a CID agent testified that at some point Flaming left

the army but still lived with his wife in South Korea.  At that point, "he was just a

normal dependent citizen," R. Vol. II at 80, as he admitted to CID investigators, *see*

*id.* at 59.

Flaming's main response is that the government needed to provide

"affirmative evidence" of Flaming's *lack* of South Korean nationality, like (he says)

the questionnaire in *Williams*.  Aplt. Br. at 33–34.  Essentially, Flaming would have

us hold that the government can prove his non-nationality only through direct

evidence proving that (at some point in time, at least) he was not a South Korean

national.[7] *See id.*  But surely, the jury could rely on the circumstantial evidence

alone.  *See Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003) ("[W]e have never

questioned the sufficiency of circumstantial evidence in support of a criminal

conviction, even though proof beyond a reasonable doubt is required.").  To suffice,

the circumstantial evidence here did not need to irrefutably negate the possibility that

Flaming held South Korean nationality.  *See United States v. Wood*, 207 F.3d 1222,

1228 (10th Cir. 2000) ("[T]he evidence necessary to support a verdict 'need not

---

[7] Again, the *Williams* questionnaire might have been direct evidence of the defendant's non-German nationality when he completed it; it was, however, only circumstantial evidence of the ultimate fact in issue, the defendant's non-German nationality at the time of the crime.  *See* 836 F.3d at 8.

conclusively exclude every other reasonable hypothesis and need not negate all possibilities except guilt.'" (quoting *United States v. Wilson*, 182 F.3d 737, 742 (10th Cir. 1999))).   And in some ways, the evidence we have here is arguably even better than that in *Williams*; as opposed to the *Williams* defendant's "dated" information from about a decade before the crime, *see* 836 F.3d at 8, we have Flaming's information collected a day after the November 18 incident from "a database that *is maintained* . . . for everybody that has served in the service," R. Vol. II at 71 (emphasis added), which the jury could understand to mean that DoD keeps the information up-to-date.

Considering all the evidence in the light most favorable to the government, no error, let alone a plain one, occurred.  The jury had sufficient evidence to find that Flaming was not a South Korean national.

**B.**

Flaming next challenges the sufficiency of the evidence underlying the jury's finding that he received images of child pornography.  Below, Flaming preserved his sufficiency-of-the-evidence challenge on whether he received images of child pornography by raising it in his motion for judgment of acquittal.  Accordingly, we review this issue de novo.  *See United States v. Rufai*, 732 F.3d 1175, 1188 (10th Cir. 2013).

In considering a sufficiency-of-the-evidence challenge, "we review the entire record in the light most favorable to the government to determine whether the evidence is such that a reasonable jury could find the defendant guilty beyond a

reasonable doubt." *Sapp*, 53 F.3d at 1103 (quoting *United States v. Dirden*, 38 F.3d 1131, 1142 (10th Cir. 1994)). We ask whether "*any* rational trier of fact could have found the essential elements of the crime . . . beyond a reasonable doubt." *United States v. Emmons*, 24 F.3d 1210, 1217 (10th Cir. 1994) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). "To the extent that the evidence conflicts, 'we accept the jury's resolution of conflicting evidence and its assessment of the credibility of witnesses.'" *Sapp*, 53 F.3d at 1103 (quoting *Dirden*, 38 F.3d at 1142).

To determine whether Flaming received child pornography, the jury could rely on direct or circumstantial evidence. *See Atencio*, 435 F.3d at 1232. And as relevant here, "[a]n individual who downloads material takes possession or accepts delivery of the visual image . . . has therefore certainly received it." *United States v. Mohrbacher*, 182 F.3d 1041, 1048 (9th Cir. 1999).

Flaming concedes that images were found on the Lenovo computer seized from the apartment where he was living in South Korea. Aplt. Br. at 36. And he "does not . . . contest that the images contain child pornography that is obscene." *Id.* at 16 n.2. Still, he argues that "no evidence" supports that *he* was the person who downloaded—meaning, received—the images. *Id.* at 37. Not so. Plenty of evidence suggests that the person who received the images was Flaming.

Although there was no direct evidence placing Flaming at the Lenovo computer when an image was downloaded, circumstantial evidence permitted the jury to draw that inference. Evidence at trial showed that the computer sat in the apartment where Flaming lived with his wife and two children. And several pieces of

17

evidence indicated that he had access to that computer. A search of the computer uncovered images of Flaming's driver's license, rations card, and personal Skype account. Also, Siberian Mouse images—which, again, contain child pornographic content—were sent on the Lenovo computer via Flaming's personal Skype account to his wife's Skype account. No evidence suggests that anyone other than Flaming had access to his personal Skype account. Moreover, the discovery of search terms commonly associated with child pornography, joined with Doe's testimony that Flaming had shown her images of child pornography, again bolsters the inferential finding that Flaming downloaded the image in question.

This is not the first case where this Court has upheld a conviction on the receipt or possession of child pornography based on circumstantial evidence. *See, e.g.*, *United States v. Schene*, 543 F.3d 627, 639–40 (10th Cir. 2008). In *United States v. Schene*, like in this case, a defendant did "not contest that [a] computer contained the charged images of child pornography." *Id.*; *see* Aplt. Br. at 16 n.2. This Court upheld the *Schene* defendant's conviction based on similar facts present here. The investigators found images of child pornography appearing under the defendant's user account, the defendant had access to the account, and "witnesses testified regarding the likelihood of [the defendant] . . . viewing the child pornography." *Schene*, 543 F.3d at 640.

Taken together, ample evidence allowed the jury to find "that it was [Flaming], and not someone else, who committed the crime[] charged." *See id.* at 639 (rejecting the defendant's argument that someone else downloaded images of

child pornography when only two people had access to the computer and evidence tied the images to the defendant's personal account).

In response, Flaming argues that the lack of specific evidence of *when* the images were received undermines the jury's finding. So, the logic goes, the computer could have had the images downloaded in the United States, not in South Korea as the MEJA requires. Along those lines, Flaming adds that the government provided no specific evidence of *where* the computer was when the images were received. But his arguments disregard the record. Forensic examination of the computer showed that images of child pornography were downloaded onto the Lenovo computer during the time that Flaming was in South Korea. Moreover, no evidence suggests that Flaming or anyone else ever used the computer in Colorado, which again bolsters the inference that the image was downloaded in South Korea.

Sufficient evidence supported the jury's finding that Flaming received child pornography in South Korea. Thus, Flaming's challenge fails, and the district court did not err when it overruled Flaming's motion on this issue.

## C.

Flaming's next argument challenges the sufficiency of the evidence supporting Count 5 of his indictment. On appeal, he contends that the jury lacked sufficient evidence to find that he attempted to cause a minor to engage in a sexual act by placing her in fear.

Count 5 charged Flaming with "knowingly attempting" to cause Doe to engage in a sexual act by threatening or placing her in fear, in violation of 18 U.S.C.

19

§ 2242(1). And the district court instructed the jury, without objection, that it could find that Flaming "knowingly attempted to cause [Doe] to engage in a sexual act" if it found *either* that he "threaten[ed] [Doe] *or* place[d] [her] in fear." R. Vol. I at 166 (emphasis added).

Flaming moved for a judgment of acquittal on Count 5 on the basis that § 2242(1) "requires a threat" and there was no proof he ever threatened Doe on the night in question. R. Vol. II at 316. At the same time, Flaming "underst[oo]d from the evidence that" Flaming's "lewd or indecent proposition [of oral sex] . . . frightened the minor." *Id.*

In opposing the motion, the government explained that "there is no element that [Doe] had to be threatened," and that the jury could instead base its finding on the fact that Flaming's behavior placed her in fear on the night in question. *Id.* at 318.

The government states that "[o]n appeal, Flaming no longer argues, as he did below to the court and the jury, that Count 5 'requires a threat'; instead, he asserts the evidence is insufficient to show that he '*intended to use fear* to cause [Doe] to engage in a sexual act.'" Aple. Br. at 32 (citation omitted). Reviewing Flaming's motion to the district court, R. Vol. II at 316, we agree. As a result, we review Flaming's argument on appeal for plain error, understanding that "our review for plain error in this context differs little from our de novo review of a properly preserved sufficiency claim." *Gallegos*, 784 F.3d at 1359. We thus view the evidence in the light most favorable to the government and ask whether the evidence and reasonable inferences

drawn from it would allow a reasonable jury to find the defendant guilty beyond a reasonable doubt. *Id.*

18 U.S.C. § 2242(1) states:

> Whoever, in the special maritime and territorial jurisdiction of the United States or in a Federal prison, or in any prison, institution, or facility in which persons are held in custody by direction of or pursuant to a contract or agreement with the head of any Federal department or agency, knowingly—
>
> (1) causes another person to engage in a sexual act by threatening or placing that other person in fear (other than by threatening or placing that other person in fear that any person will be subjected to death, serious bodily injury, or kidnapping) . . . or attempts to do so, shall be fined under this title and imprisoned for any term of years or for life.

Count 5 relates to the alleged events of the November 18 incident, the day that Doe testified that Flaming told her to perform oral sex on him.

As this Court has recognized, "[t]he definition of 'fear,' as used in 18 U.S.C. § 2242(1), is very broad," and it "is satisfied when the defendant's actions implicitly place the victim in fear of some bodily harm." *United States v. Castillo*, 140 F.3d 874, 885 (10th Cir. 1998); *see United States v. Holly*, 488 F.3d 1298, 1303 (10th Cir. 2007) ("A violation of § 2242(1) merely requires that the defendant 'causes another person to engage in a sexual act by threatening or placing that other person in fear (other than by threatening or placing that other person in fear that any other person will be subjected to death, serious bodily injury, or kidnapping).'").

And this Court has gone further to recognize "[w]hen an older person attempts to molest a child, there is *always* a substantial risk that physical force will be used to

21

ensure the child's compliance." *Castillo*, 140 F.3d at 885 (emphasis added) (citing *United States v. Reyes-Castro*, 13 F.3d 377, 379 (10th Cir. 1993)). So much so that this Court has upheld a jury's conviction under § 2242(1) because, "simply from the nature of the circumstances, [] a male parent attempting to perform sexual acts with his children would place them in fear of bodily harm." *Id.* Such circumstances are even more obvious when a defendant has previously physically abused a child victim. *See id.* at 885–86.

Flaming does not dispute that his conduct "frightened" Doe generally. R. Vol. II at 316. Flaming, while naked, R. Vol. I at 59, demanded that Doe "get him off," R. Vol. II at 274, 300. That demand, the fact that he was naked, and the fact that he had previously sexually abused Doe collectively allowed the jury to infer that Doe specifically was afraid of her stepfather abusing her again. *Compare Castillo*, 140 F.3d at 885–86 (finding evidence of a mother witnessing a defendant physically abusing a minor allowed a jury to infer "implicit threats of bodily harm" to the minor), *with* R. Vol. II at 276 (testifying that Flaming, while drunk, "got on top of [Doe] and tried to get [her] to suck his penis and he tried to force his penis into [her] mouth," while also "chok[ing] [her] up against a wall" when she refused). These circumstances allowed the jury to infer that "a male parent attempting to perform sexual acts with his child[] would place [her] in fear of bodily harm." *Castillo*, 140 F.3d at 885.

In response, Flaming makes two arguments. First, he asks us to find that he only intended Doe "to leave the apartment," Aplt. Br. at 41, instead of what the jury

22

found—that he intended Doe to engage in a sexual act. We decline to view the evidence this way. Giving in to Flaming's request would be to view the evidence in the light most favorable to him instead of to the government, which we cannot do. *See Gallegos*, 784 F.3d at 1359. For that reason, his argument asking us to reweigh the evidence gets him nowhere.

Next, Flaming argues that "even if [Doe] was scared, that does not prove it was Mr. Flaming's plan to scare [Doe] into having sex with him." Aplt. Br. at 40. In all, Flaming wants us to revisit § 2242(1) in the attempt context and require that defendants have the specific intent to put someone in the fear of harm.

Our precedent forecloses the argument. In *United States v. Castillo*, we held that placing someone in "fear" under § 2242(1) only requires "the defendant's actions [to] implicitly place the victim in fear of some bodily harm." 140 F.3d at 885. We then talked about specific intent under § 2242—or rather, the lack thereof. *Castillo* stated that § 2242, "which prohibits sexual acts, require[s] that the defendant 'knowingly' committed the act" but does *not* contain a "specific intent element" like other sections of the statute have. *Castillo*, 140 F.3d at 886 (quoting 18 U.S.C. § 2242). Thus, *Castillo* bars Flaming's argument that the "fear" element under § 2242 requires that a defendant specifically intend to place a victim in fear. *See id.*

In sum, sufficient evidence supported the jury's finding that Flaming "knowingly . . . cause[d] another person to engage in a sexual act by . . . placing that other person in fear . . . or attempt[ed] to do so." 18 U.S.C. § 2242(1). No error, plain or otherwise, occurred.

23

### III.

Flaming next switches his focus to the district court's evidentiary rulings. Flaming argues that (A) the district court (i) violated Flaming's Sixth Amendment rights under the Confrontation Clause and (ii) abused its discretion under the Federal Rules of Evidence by limiting the cross-examination of Doe on her purported prior statements that Flaming had not sexually abused her in South Korea.  Next, Flaming contends that (B) the district court abused its discretion by allowing the government to introduce versions of electronically stored information, in violation of the best evidence rule and Federal Rule of Evidence 1006.  Flaming's arguments fail.

### A.

On direct examination, Doe testified that she had been sexually abused by Flaming in the third grade when she lived in Colorado.  *See* R. Vol. II at 277–78 (describing the ways that Flaming touched Doe sexually while living in Colorado). Doe also testified that Flaming attempted to sexually abuse her in South Korea.  *See id.* at 275–76 (describing an incident where Flaming attempted to make Doe perform oral sex and choked her while living in South Korea).  On cross-examination, Doe reaffirmed that "there were things that happened in Colorado and things that happened in Korea."  *Id.* at 279.

Putting the abuse in Colorado aside, Flaming focused on challenging Doe's testimony about the attempted abuse in South Korea.  Flaming elicited testimony from Doe that she talked to CID investigators "probably about three to four separate times."  *Id.* at 280.  But when asked about whether Doe ever told the investigators

about Flaming touching her in South Korea, she said "I don't remember." *Id.* At the same time, Doe stated that she did "remember talking to people after [she] moved back from Korea into Colorado." *Id.* But she again did not remember telling people in Colorado that Flaming had touched her while in South Korea.

Flaming then attempted to elicit testimony from Doe to challenge what she remembered from her conversations with others. Specifically, Flaming asked Doe if she remembered speaking to anyone at "Sungate Kids" in Colorado in 2017, to which she responded yes. *Id.* at 283. Doe was then asked whether she remembered telling anyone there that Flaming had not touched her in South Korea.

The government objected to this line of questioning as "improper impeachment" because Flaming had not introduced Doe's alleged "prior inconsistent statement" to the investigators. *Id.* Flaming responded that he was merely "trying . . . to see what she remembers." *Id.* The district court sustained the government's objections because Flaming was "essentially speculating that [Doe] made an inconsistent statement" and "need[ed] to bring up the inconsistent statement" to lay a proper foundation. *Id.*

Flaming then pivoted and asked Doe whether it would refresh her memory to review a report of an interview she gave to the authorities in South Korea on December 8, 2016, and she agreed it would. The report states in relevant part as follows:

> UNIDENTIFIED PERSON: What about did he try putting
> his private in your mouth?

[DOE]: Yeah.

UNIDENTIFIED PERSON: Yeah? How many times did he do that, just that one time?

[DOE]: (No audible response.)

UNIDENTIFIED PERSON: Just that one time? And that was here in Korea or in Colorado?

[DOE]: In Colorado.

R. Vol. III at 38–39.

During a sidebar, Flaming advised the district court that, even though the transcript reflected that Doe gave "[n]o audible response" when she was asked if Flaming abused her "many times," counsel believed that it was apparent from the video that "she says no" in response to that question. R. Vol. II at 286. The district court disagreed that Doe's "[in]audible" talking indicated this response and refused to "let [counsel] testify as to what [he] heard when the court reporter said 'no audible response.'" *Id.*

Having no success there, Flaming then requested to "refresh [Doe's] memory with the actual video and not the transcript." *Id.* The district court, "outside the hearing of the jury," allowed Flaming to refresh her memory with the video. *Id.* at 287.

A short time later, the court, still outside the presence of the jury, provided an explanation of what transpired during the recess. The court stated that Flaming "did not find a videotape of the December 8th, 2016, interview, and the transcript of that

26

interview states that this witness' response to that question was not audible." *Id.* at 288.

That said, Flaming *was* able to find "a video of a subsequent interview that occurred on January 8th, 2017, in Korea" that "refers to a previous interview, presumably the December 8th, 2016, interview." *Id.* Flaming then tried to show the video of the subsequent interview for the purpose of showing "an inconsistent statement with [Doe's] testimony on direct." *Id.* at 289.

Flaming again ran into "a problem." *Id.* ("The video's not running here, it's just static, we have a frozen frame here."). The district court stated, "we can't get that impeachment in, if it is indeed impeachment, because the technology is not working." *Id.* Flaming agreed. *Id.* And so, the court "sustain[ed] the [government's] objection for improper impeachment." *Id.* at 290.

Cross-examination continued. Doe testified that she did not recall being asked by police in South Korea whether Flaming put his penis in her mouth. *Id.* Flaming again asked Doe if it would refresh her memory if she saw her statement in the December 8, 2016 interview, which only contained the reporter's notation of "[n]o audible response." *Id.* The government objected. *Id.* at 291 ("Your Honor. We've gone through this already."). The district court sustained the objection. The court explained that Doe's answer merely confirmed her direct examination testimony that Flaming had attempted to perform oral sex in Colorado and did not address nor impeach her testimony that Flaming had attempted to force her to perform oral sex in South Korea.

Flaming then tried again. Doe agreed that she had testified earlier that Flaming tried to put his penis in her mouth while they were in South Korea. She agreed that she could not recall what she told investigators in South Korea about Flaming attempting to put his penis in her mouth while she was in South Korea, but she agreed that looking at the December 8, 2016 transcript may help her remember. The government asked to approach, and, with no objection made, the district court stated that "the objection's sustained," having "been over this three or four times." *Id.* at 294. The court directed defense counsel to "move on." *Id.*

On appeal, Flaming challenges the district court's ruling on cross-examination (i) under the Confrontation Clause and (ii) under the Federal Rules of Evidence. We address each in turn.

**i.**

Flaming raises a Sixth Amendment challenge to the district court's limitation on cross-examination. Before turning to the merits, we must determine the applicable standard of review. It is worth noting that "[t]here may be some tension within our circuit's precedents as to the proper standard of review for confrontation claims premised on cross-examination restrictions." *United States v. Mullins*, 613 F.3d 1273, 1283 n.4 (10th Cir. 2010). That said, we need not look to those precedents in this instance because Flaming did not preserve his constitutional argument below. He forfeited his constitutional claim, and as such, we review the claim on appeal for plain error. *See United States v. Leffler*, 942 F.3d 1192, 1196 (10th Cir. 2019). To prevail, then, Flaming must show "(1) error, (2) that is plain,

which (3) affects substantial rights, and which (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Mike*, 632 F.3d at 691–92 (quoting *Gonzalez-Huerta*, 403 F.3d at 732). "We conduct this analysis less rigidly when reviewing a potential constitutional error." *Id.* at 692 (quoting *United States v. Dazey*, 403 F.3d 1147, 1174 (10th Cir. 2005)).

Quoting generally from several Confrontation Clause cases, Flaming first argues that the district court's ruling against admitting a purported prior inconsistent statement violated the Sixth Amendment. But Flaming fails to show any error.

A criminal defendant's Sixth Amendment right "to be confronted with the witnesses against him," U.S. Const. amend. VI, affords "the opportunity of cross-examination," *Davis v. Alaska*, 415 U.S. 308, 315–16 (1974). The Confrontation Clause thus grants "the right to confront the prosecution's witnesses for the purpose of challenging their testimony." *Washington v. Texas*, 388 U.S. 14, 19 (1967).

That said, the right has its limits. "[T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986). Trial judges retain this discretion because "the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Id.* (quoting *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985) (per curiam)).

29

Looking at the limitation on cross-examination here, the district court did not err, plainly or otherwise.  The court's limitation was "directed only to the general *extent* of cross-examination" by what Flaming could lay a proper foundation for. *United States v. Atwell*, 766 F.2d 416, 419 (10th Cir. 1985) (per curiam).  The court told him directly that if he wanted to impeach Doe using a prior inconsistent statement, he "need[ed] to bring up the inconsistent statement."  R. Vol. II at 283.  Indeed, Flaming had multiple opportunities to cross-examine Doe on any prior inconsistent statements; he merely failed to provide the proper foundation to get the cross-examination to where he wanted.

Again and again, the district court allowed Flaming to cross-examine Doe about any prior inconsistent statement.  *See id.* at 282–84 (cross-examining Doe about what she said to others).  And not only that—the court allowed him to attempt to lay a foundation for the statement through other methods.  *See id.* at 288 (a video of the December 8, 2016 interview); *id.* at 289 (a video of a "January 8th, 2017, interview with CID investigators in Korea" that "refers to a previous interview, presumably the December 8th, 2016, interview").

But the problem was that Flaming could not point to anything Doe had actually said that was inconsistent with her testimony.  Instead, the only thing Flaming pointed to was an interview where Doe gave "[n]o audible response," *id.* at 286, and where her statements were merely "consistent" with her statement that Flaming attempted to obtain oral sex in Colorado, *id.* at 292.

30

Thus, it is clear that Flaming was afforded the opportunity to develop his impeachment strategy based on inconsistent statements. Nowhere did the district court say that Flaming could not talk about the "entire *area*" of any prior inconsistent statements. *Atwell*, 766 F.2d at 419. Rather, the court repeatedly permitted him to try to lay a foundation for such statements. Seeing that Flaming failed to lay a foundation, the court simply limited the "general *extent*" of the inquiry into what Flaming could actually point to as inconsistent—which, in this case, was nothing. *Id.* Thus, the court imposed no more than "reasonable limits on [] cross-examination." *Van Arsdall*, 475 U.S. at 679. No error, let alone a plain one, occurred.

**ii.**

We next determine whether the district court abused its discretion under the Federal Rules of Evidence. *See United States v. Dowlin*, 408 F.3d 647, 659 (10th Cir. 2005). Under the abuse-of-discretion standard, "we will not disturb an evidentiary ruling absent a distinct showing that it was based on a clearly erroneous finding of fact or an erroneous conclusion of law or manifests a clear error in judgment." *Id.* (brackets omitted) (quoting *United States v. Jenkins*, 313 F.3d 549, 559 (10th Cir. 2002)).

Flaming argues that he attempted to "impeach" Doe "with her prior inconsistent statements" "under Rule 613(b)," and that, if the district court had allowed the cross-examination to proceed, Doe would have had the opportunity to explain her prior denials that Flaming assaulted her in South Korea. Aplt. Br. at 47. Relatedly, Flaming argues that the district court should have allowed "the prior

31

statements to refresh [Doe]'s memory" under Rule 612, because she testified that she could not remember what she told investigators in South Korea and she agreed each time that reviewing the interviews could help her remember. *Id.*

Prior inconsistent statements are an accepted means of impeaching a witness, but before a defendant may do so, he must first lay an adequate foundation. *See Wheeler v. United States*, 382 F.2d 998, 1000–01 (10th Cir. 1967) ("It is generally accepted that after a proper foundation has been laid, a witness' testimony may be discredited by showing former inconsistent or contradictory statements, and the jury is entitled to consider such inconsistent statements in determining the weight to be given to the witness' testimony.").

To lay a foundation, Flaming had to demonstrate that Doe's prior statements to investigators were in fact inconsistent with her trial testimony. In other words, "[a]s a preliminary matter," Flaming needed to provide at least two statements that he thought were inconsistent for the court's consideration. *United States v. Hale*, 422 U.S. 171, 176 (1975). Only then could a court "be persuaded that the statements are indeed inconsistent." *Id.* And if one fails to "establish a threshold inconsistency," the purported statement offered for impeachment "lacks any significant probative value and must therefore be excluded." *Id.*

Here, despite repeated efforts employing cross-examination responses, investigation reports, and videos, Flaming could not offer any evidence that Doe ever told investigators that Flaming had not abused or attempted to abuse her in South Korea. The district court thus did not abuse its discretion in finding that Flaming

failed to "establish a threshold inconsistency." *Id.* Unless Flaming could first "bring up the inconsistent statement," this line of questioning was mere "speculat[ion]" that Doe had made an inconsistent statement. R. Vol. II at 283–84. All considered, no prior inconsistent statement could be admitted, *see* Fed. R. Evid. 613, nor was there any writing that Flaming could produce that could refresh Doe's memory, *see* Fed. R. Evid. 612.

In response, Flaming attempts to read the transcript of Doe's interview in a way in which Doe conceivably provided a prior inconsistent statement. Keeping in mind our standard of review, we cannot read the transcript as Flaming would have us.

In the report, an interviewer asked Doe whether Flaming had "tr[ied] putting his private in [her] mouth," and, after she acknowledged he had, the interviewer then asked, in a single statement, "[h]ow many times did he do that, just that one time?," to which there was "[n]o audible response." R. Vol. III at 38–39. Without any "audible response," the interviewer continued his line of questioning, first repeating his last question, "Just that one time?," and then asking, "that was here in Korea or in Colorado?" *Id.* at 39. Doe did not fully answer both questions, only replying, "[i]n Colorado." *Id.*

From this dialogue, Flaming believes that Doe told investigators that he did not attempt to obtain oral sex from her in South Korea, thereby creating an inconsistent statement. Flaming's argument may carry some weight if one reads into what Doe does not say. In Flaming's interpretation, Doe's silence may have acknowledged that an incident with Flaming occurred "[j]ust that one time" and that

it only occurred "[i]n Colorado." *Id.* In the government and the district court's interpretation, however, Doe only responded to the question that Flaming assaulted her in "Colorado" and did not respond to whether it happened other "times" or whether it happened in South Korea as well. *Id.*

We cannot forget that the standard of review here determines what to do when the record supports two viable yet contradictory positions. Under an abuse-of-discretion standard, "we will not disturb an evidentiary ruling absent a distinct showing that it was based on a clearly erroneous finding of fact." *Dowlin*, 408 F.3d at 659 (cleaned up). And "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *United States v. Martinez*, 92 F.4th 1213, 1227 (10th Cir. 2024) (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 574 (1985)).

Out of two viable interpretations of the transcript, the district court chose one. The record supports the district court's decision that Doe's "[i]n Colorado" statement did not say that this was the only time Flaming forced her to give him oral sex. R. Vol. III at 39. Indeed, the transcript shows that she did not answer the investigator's question about how many times Flaming's attempted abuse occurred. *Id.* Instead, the only thing the statement shows is that Flaming abused Doe in Colorado, which is not inconsistent with her testimony that he abused her in Colorado *and* South Korea. Thus, Flaming's argument fails.

**B.**

Lastly, Flaming maintains that the district court abused its discretion by allowing the government to introduce summaries of electronically stored information, in violation of the best evidence rule. Despite titling the issue in his brief as dealing with the "best evidence rule," Aplt. Br. at 50, he does not provide analysis using the rule. Flaming's briefing is best understood as a different challenge to admitting summaries of his Skype chats with his wife under Federal Rule of Evidence 1006. As such, Flaming waives the best-evidence-rule argument by failing to adequately brief the issue on appeal. *See Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 679 (10th Cir. 1998) ("Arguments inadequately briefed in the opening brief are waived."); *United States v. Kunzman*, 54 F.3d 1522, 1534 (10th Cir. 1995) (declining to address issues only "nominally raised" and not developed "with[] supporting argument"). We only consider his argument about the admission of summaries under Rule 1006.

This Court reviews a district court's rulings on evidentiary matters under Rule 1006 for abuse of discretion. *United States v. Thompson*, 518 F.3d 832, 858 (10th Cir. 2008). An abuse of discretion occurs if the district court's ruling "was based on a clearly erroneous finding of fact or an erroneous conclusion of law or manifests a clear error in judgment." *Dowlin*, 408 F.3d at 659 (quoting *Jenkins*, 313 F.3d at 559).

In anticipation of trial, the government's forensic expert, James Fottrell, reviewed the Skype chat returns obtained from Microsoft associated with Flaming's wife's Skype account, and created a set of documents summarizing and organizing

35

her chats with Flaming. At trial, after the government qualified Fottrell as an expert, Fottrell testified that the documents were accurate depictions of the actual data that law enforcement received from Microsoft pursuant to the search warrant return for the wife's Skype account. Fottrell had prepared the documents using the information he had obtained from "the LG phone associated with" Flaming's wife. R. Vol. II at 266. And as the government moved to admit these documents, Fottrell stated that the documents were accurate copies of documents that he prepared for trial, but he did not specifically say they were accurate representations of the underlying data.

Flaming objected to the admission of Fottrell's documents, asserting they were "demonstrative aids and not an exhibit or actual evidence." *Id.* at 248. The government argued that the documents were admissible because they contained "excerpts of the [Skype] chats" reflecting Flaming's own words, and that it was neither necessary nor practical to introduce the 90 or so pages of the chats themselves because they "contain[ed] numerous amounts of hearsay that would not be able to get into evidence before the jury." *Id.* The district court agreed with the government and admitted the documents. Following Fottrell's direct examination, Flaming "ha[d] no questions for this witness." *Id.* at 269.

The Federal Rules of Evidence allow a party to present "*a summary*, chart, or calculation *to prove the content of voluminous writings*, recordings, or photographs *that cannot be conveniently examined in court*." Fed. R. Evid. 1006(a) (emphases added). "Although the information upon which a Rule 1006 summary is created need

not itself be admitted into evidence, it must still be admissible." *United States v. Channon*, 881 F.3d 806, 810 (10th Cir. 2018).

Rule 1006 also requires that to introduce a summary into evidence, its "proponent must make the originals or duplicates available for examination or copying, or both, by other parties at a reasonable time and place." Fed. R. Evid. 1006(b). To define "originals" in Rule 1006, we look to Rule 1001(d), which defines an "original" of electronically stored information as "any printout—or other output readable by sight—if it accurately reflects the information." Fed. R. Evid. 1001(d). "In other words, the question is whether the spreadsheets [or summaries] accurately reflect the information found in the underlying database." *Channon*, 881 F.3d at 810. And "[t]he government is required to lay a foundation to this effect." *Id.*

Also relevant here, under Rule 801, hearsay is defined as an oral or written assertion made by a declarant outside of a trial or hearing and offered to prove the truth of the matter asserted. Fed. R. Evid. 801(c). That said, Rule 801(d)(2)(A) provides a relevant exclusion: a statement that "is offered against an opposing party" and that "was made by the party" is not hearsay. Fed. R. Evid. 801(d)(2)(A).

Flaming asserts that the district court erroneously admitted Fottrell's summaries "in lieu of evidence." Aplt. Br. at 53. This could not be further from the truth. The government admitted evidence. And Rule 1006 allowed the government to present "a summary . . . to prove the content of voluminous writings . . . that cannot be conveniently examined in court." Fed. R. Evid. 1006(a).

37

Importantly, "the information upon which a Rule 1006 summary is created need not itself be admitted into evidence." *Channon*, 881 F.3d at 810. But that information on which the summary is based "must still be admissible." *Id.* Here, the district court properly admitted the summaries of the Skype chats because the underlying information—Flaming's chats with his wife—was admissible against Flaming as an opposing party admission, and thus not hearsay, under Federal Rule of Evidence 801(d)(2)(A). *See United States v. Alcorta*, 853 F.3d 1123, 1142 (10th Cir. 2017) (holding that "all the phone calls in which Defendant participated and his text messages . . . were admissible against him under Rule 801(d)(2)(A) as statements by an opposing party").

Flaming's next argument is that Fottrell "did not say that the [underlying materials were] 'voluminous.'" Aplt. Br. at 52. Rule 1006 allows summaries to be used if they "prove the content of *voluminous* writings." Fed. R. Evid. 1006(a) (emphasis added). The Rule does not further define voluminous, nor does it require a party to say the word "voluminous" in proving that a summary covers "voluminous writings." *Id.*

Here, the record supports the district court's ruling. In response to Flaming's objection, the government explained that the Fottrell documents summarized between 90 and 100 pages of Skype messages, which contained "numerous amounts" of inadmissible hearsay. R. Vol. II at 248. With that as the dialogue, we cannot disturb the district court's evidentiary ruling because it was neither "based on a clearly

erroneous finding of fact" or "a clear error in judgment." *Dowlin*, 408 F.3d at 659 (quoting *Jenkins*, 313 F.3d at 559).

Flaming next attacks Fottrell's methodology in creating these summaries, claiming that Fottrell "cherry pick[ed]" from the underlying data. Aplt. Br. at 53. But Fottrell testified—and the district court found when it admitted the summaries— that those documents were accurate representations of the underlying data. R. Vol. II at 247. When asked whether the summaries were "true and accurate depictions of the data [Fottrell had] seen," Fottrell responded that "[a]lmost all of [the data] came from the Skype search warrant return for [Flaming's wife's] account." *Id.*

In sum, Flaming waives his argument under the best evidence rule, to the extent he makes one, by failing to adequately brief the issue on appeal. And the district court did not abuse its discretion in admitting summaries of Flaming's Skype chats with his wife under Fed. R. Evid. 1006 because the information contained in the summaries was admissible in itself, voluminous, and accurate from the original data.

**IV.**

For these reasons, we AFFIRM.