**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**May 18, 2026**

**Christopher M. Wolpert**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

GARRIN MICHAEL THOMPSON,

    Defendant - Appellant.

No. 24-5052

_____

**Appeal from the United States District Court**
**for the Northern District of Oklahoma**
**(D.C. No. 4:22-CR-00118-JFH-1)**

_____

Gregory M. Acton, Acton Law Office, PC, Albuquerque, NM, for Defendant-Appellant.

Elliot P. Anderson, Assistant United States Attorney (Clinton J. Johnson, United States Attorney, with him on the brief), United States Attorney's Office, Northern District of Oklahoma, Tulsa, OK, for Plaintiff-Appellee.

_____

Before **PHILLIPS**, **MURPHY**, and **EID**, Circuit Judges.

_____

**EID**, Circuit Judge.

_____

Garrin Michael Thompson sexually abused his ten-year-old daughter in the bathtub and bed of a hotel room in Texas. When she disclosed the incident to some of her peers, three others came forward about their own sexually abusive experiences with Thompson. After a three-day trial, a jury convicted Thompson of transportation

Appellate Case: 24-5052     Document: 47-1     Date Filed: 05/18/2026     Page: 2

of a minor with intent to engage in criminal sexual activity, aggravated sexual abuse of a minor in Indian Country, and coercion and enticement of a minor.

Thompson now appeals, arguing that there was insufficient evidence to prove all the elements of the transportation of a minor and sexual abuse of a minor charges. On the transporting a minor charge, Thompson claims that the government needed, and failed, to prove that his "dominant purpose" for transporting his daughter to Texas was engaging in sexual activities with her. And as for the sexual abuse charge, Thompson argues that the government failed to prove the necessary element that he was a non-Indian.

We affirm. First, the government did not need to prove that Thompson's "dominant purpose" for transporting his daughter to Texas was engaging in sexual activities with her to convict him on the transportation charge. Rather, the statutory provision under which Thompson was charged, 18 U.S.C. § 2423(a), required only that the government prove that Thompson transported his daughter to Texas "with intent" that she engage in illicit sexual activity. The government adduced sufficient evidence for the jury to make that finding. Second, the government's evidence— unchallenged testimony from two of Thompson's family members—sufficed to prove beyond a reasonable doubt that Thompson was a non-Indian. We reject Thompson's contention that the government was required to disprove his Indian status through documentary evidence or through similarly corroborated testimonial evidence.

**I.**

In March 2022, Thompson drove his ten-year-old daughter, A.T., from their home in Catoosa, Oklahoma, to Tyler, Texas, where A.T. was scheduled to compete in a gymnastics meet. A.T.'s mother and Thompson's wife, Holly—who usually accompanied Thompson and A.T. to meets—was unable to travel because she was ill with ulcerative colitis and had a colonoscopy scheduled for the day after the meet. As a result, A.T. was left alone with Thompson for the duration of the trip.

The day before the competition, the pair checked into a hotel. Hoping to swim, they changed into their bathing suits but decided to return to their room after discovering the hot tub was closed. Thompson asked A.T. if she wanted to get into the bathtub with him. She told him she "didn't really want to do it," but he insisted. R. Vol. I at 382. Thompson then stripped naked, got into the tub, and told A.T. to "just take [her bathing suit] off and get in." *Id.* at 383. Eventually, A.T. took off her suit and joined Thompson in the tub.

Thompson positioned A.T. on top of his stomach and "just . . . la[id] there" for a moment. *Id.* at 384. He then placed his bare hand on her vagina, washed it with a washcloth, and kissed A.T. around her neck. A.T. offered to wash his hair to get out of the situation. After she did that, the two exited the tub and dried off, but Thompson did not get dressed. When A.T. tried to put on her pajamas, Thompson told her, "we don't need that . . . you don't need it." *Id.* at 387. A.T. later joined Thompson in bed because the couch was occupied by their luggage. Thompson positioned her on top of him, placed his hands on her vagina, and began kissing her

3

body.  The abuse continued until A.T. asked Thompson if he was ready to go to bed, at which point he released her.

The next morning, after A.T. competed at her meet, Thompson drove her back to Oklahoma and instructed her not to tell her mother what had happened.  A.T., however, told a friend, and then her sisters, about the abuse approximately one month later.

A.T.'s disclosure prompted three others to come forward about their own abusive experiences with Thompson.

S.T.—A.T.'s half sister and Thompson's daughter from a prior marriage—revealed that Thompson often "tickled" her on her inner thigh, lower stomach, and groin during her early childhood in Broken Arrow, Oklahoma.  She further testified that when she was five or six years old, Thompson lured her into his bedroom, where he told her to undress and get on the bed before performing oral sex on her.  Each time the abuse occurred, S.T.'s mother was out of the house.

C.S.—A.T.'s half sister and Holly's daughter from her prior marriage—similarly revealed that Thompson frequently touched her vagina, both clothed and unclothed, when her mother was gone.  She also claimed Thompson had sexually touched her when she was seven or eight years old and the two were alone in a car.  On several of these occasions, Thompson lured C.S. into a room or car by promising to buy her something in exchange.  Like S.T., C.S. never told anyone about the abuse until A.T. came forward.

4

A.J.—Thompson's brother-in-law from his prior marriage, and a minor at the time of the following incidents—claimed that Thompson showed him a pornographic movie while Thompson's ex-wife was sleeping. A.J. explained that Thompson removed his pants and masturbated, and then invited A.J. to do the same. A few months later, again while Thompson's ex-wife was sleeping, Thompson asked A.J. if he would like to engage in oral sex with him. After A.J. declined, Thompson showed A.J. several sex toys and explained how he used them on his ex-wife, A.J.'s sister. Thompson later showed A.J. nude photographs of A.J.'s sister.

During an ensuing investigation of these incidents, the FBI learned that Thompson had placed hidden cameras inside his home and in other areas. According to the FBI, one video, taken from a camera hidden inside a closet, depicts one of Thompson's daughters undressing to take a shower and returning a few minutes later to get dressed. A second video shows Thompson hiding a camera in the guest bathroom of their home. And a third video includes footage of one of Thompson's daughters changing her shirt in the bathroom of a vacation beach house.

In September 2022, a federal grand jury in the United States District Court for the Eastern District of Oklahoma charged Thompson with three crimes: (1) transportation of a minor—A.T.—with intent to engage in criminal sexual activity, in violation of 18 U.S.C. § 2423(a); (2) aggravated sexual abuse of a minor—S.T.—in Indian Country, in violation of 18 U.S.C. §§ 1151, 1152, and 2241(c); and (3) coercion and enticement of a minor—A.J.—in violation of 18 U.S.C.

§ 2422(b).[1]  A jury convicted Thompson on all three counts.  The district court sentenced Thompson to life imprisonment for each of the three counts, to run concurrently.

Thompson timely appealed, challenging the sufficiency of the evidence to support the jury's verdicts on Counts One and Two.

## II.

In examining a sufficiency-of-the-evidence challenge, "we review the entire record in the light most favorable to the government to determine whether the evidence is such that a reasonable jury could find the defendant guilty beyond a reasonable doubt."  *United States v. Sapp*, 53 F.3d 1100, 1103 (10th Cir. 1995) (quotation omitted).  We must affirm if "*any* rational trier of fact could have found the essential elements of the crime . . . beyond a reasonable doubt."  *United States v. Emmons*, 24 F.3d 1210, 1217 (10th Cir. 1994) (quotation marks omitted) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).  "We do not use this evaluation as a chance to second-guess the jury's credibility determinations, nor do we reassess the jury's conclusions about the weight of the evidence presented."  *United States v. Smith*, 133 F.3d 737, 742 (10th Cir. 1997) (quotation omitted).  Still, the evidence supporting a jury's verdict must be more than "a mere modicum," *Jackson*, 443 U.S. at 320 (cleaned up); the evidence "must be substantial, raising more than a mere suspicion of guilt," *Smith*, 133 F.3d at 742.  But the evidence "need not conclusively

---

[1] Thompson was not charged with sexually abusing C.S.

6

exclude every other reasonable hypothesis and it need not negate all possibilities except guilt" to suffice.  *United States v. Johnson*, 42 F.3d 1312, 1319 (10th Cir. 1994) (quotation omitted).

## III.

We start with Thompson's challenge to the sufficiency of the evidence to support the jury's guilty verdict on Count One, transporting a minor to engage in illegal sexual activity in violation of 18 U.S.C. § 2423(a).  Thompson contends that his conviction "must be reversed" because the government's evidence failed to prove that his "'dominant' or his 'efficient and compelling purpose' for taking his daughter to the Texas gymnastics competition was to engage in unlawful sex."  Aplt. Br. at 11–12.[2]

We disagree.  Thompson misreads what § 2423(a) requires.  And the government's evidence permitted the jury to find beyond a reasonable doubt what § 2423(a) *does* require—that Thompson took his minor daughter, A.T., to Texas "with intent" that she engage in illegal sexual activity.

## A.

The version of § 2423(a) under which Thompson was charged speaks only of

---

[2] The jury was not given a "dominant purpose" instruction; it was instructed to find whether, "[a]t the time of the transportation, [Thompson] intended that A.T. would engage in unlawful sexual activity."  R. Vol. I at 286.  Thompson did not object to this instruction.  *See* Aplt. Br. at 11 n.3.  Nevertheless, we review his sufficiency challenge de novo.  *See United States v. Simpkins*, 90 F.4th 1312, 1315 (10th Cir. 2024) ("A challenge to the sufficiency of the evidence is a separate claim of error that does not rest on how the jury was instructed." (cleaned up)).

"intent," not of "purpose." The statute read, and still reads, "[a] person who knowingly transports an individual who has not attained the age of 18 years in interstate or foreign commerce . . . with intent that the individual engage . . . in any sexual activity for which any person can be charged with a criminal offense, shall be" guilty. 18 U.S.C. § 2423(a).

Section 2423(a) has not concerned itself with "purpose" since 1948. Section 2423(a) is a derivative of § 4 of the Mann Act, which, when enacted in 1910, provided:

> That any person who shall knowingly persuade, induce, entice, or coerce any woman or girl under the age of eighteen years [across state lines], with the purpose and intent to induce or coerce her, or that she shall be induced or coerced to engage in prostitution or debauchery, or any other immoral practice, and shall in furtherance of such purpose knowingly induce or cause her to go and to be carried or transported as a passenger [across state lines] upon the line or route of any common carrier or carriers, shall be deemed guilty of a felony . . . .

White-Slave Traffic (Mann) Act, ch. 395, § 4, 36 Stat. 825, 826 (1910).

Section 2423(a) also "parallels" § 2 of the Mann Act, *see United States v. Durham*, 902 F.3d 1180, 1195 & n.8 (10th Cir. 2018), which criminalized "knowingly transport[ing]" across state lines "any woman or girl for the purpose of prostitution or debauchery, or for any other immoral purpose, or with the intent and purpose to induce, entice, or compel such woman or girl" to engage in such illicit sexual conduct.[3] Mann Act § 2, 36 Stat. at 825. In 1944, the Supreme Court interpreted § 2

---

[3] To be sure, though, today's § 2421(a) is the most direct descendant of the old § 2, as it also does not require that the transportee be a minor (unlike § 2423(a) and the old § 4). *See* 18 U.S.C. § 2421(a).

of the Mann Act to be "aim[ed] to penalize only those who use interstate commerce with a view toward accomplishing the unlawful purposes," and the Court held that § 2 made it "essential that the interstate transportation have for its object or be the means of effecting or facilitating the proscribed activities" and that "[a]n intention that the women or girls shall engage in the [illicit sexual] conduct . . . must be the dominant motive of such interstate movement." *Mortensen v. United States*, 322 U.S. 369, 373–74 (1944).

In 1948, Congress amended § 2423 and removed all references to "purpose." *See* Act of June 25, 1948, ch. 645, § 2423, 62 Stat. 683, 812–13. This version of § 2423 made it a crime to "knowingly persuade[], induce[], entice[], or coerce[] any woman or girl who has not attained her eighteenth birthday" across state lines "with intent that she be induced or coerced to engage in prostitution, debauchery or other immoral practice." *Id.* By 1986, § 2423's text read all but verbatim how § 2423(a)'s does today, outlawing "knowingly transport[ing] any individual under the age of 18 years" across state lines "with intent that such individual engage in prostitution, or in any sexual activity for which any person can be charged with a criminal offense." Child Sexual Abuse and Pornography Act of 1986, Pub. L. No. 99-628, § 5(b)(1), 100 Stat. 3510, 3511.[4] As the First Circuit observed soon after, "[n]either the

---

[4] The 1986 amendments "retired the 'purpose' test for interstate transportation" for all the Mann Act's antecedents. *See United States v. Vang*, 128 F.3d 1065, 1069 (7th Cir. 1997). But Congress brought the "purpose" language out of retirement in 1994 when it created § 2423(b), which criminalized "travel[ling] in interstate commerce . . . for the purpose of engaging in any sexual act . . . with a person under 18 years of age." Violent Crime Control and Law Enforcement Act of

purpose of, nor motive for, the transportation . . . are mentioned in the current law."

*United States v. Ellis*, 935 F.2d 385, 392 (1st Cir. 1991).[5]  Such "a significant change

in language is presumed to entail a change in meaning."  Antonin Scalia & Bryan A.

Garner, *Reading Law: The Interpretation of Legal Texts* 256 (2012); *see Ross v.*

*Blake*, 578 U.S. 632, 641–42 (2016) ("When Congress amends legislation, courts

must presume it intends the change to have real and substantial effect." (cleaned up)).

True, some of our § 2423(a) cases post-dating these amendments have

purported to apply a "dominant" or "compelling" "purpose" framework.  *See, e.g.,*

*United States v. Meacham*, 115 F.3d 1488, 1495–96 (10th Cir. 1997); *United States v.*

*Lacy*, 904 F.3d 889, 900–02 (10th Cir. 2018).  But these cases were wrong to do so.

---

1994, Pub. L. No. 103-322, § 160001(g), 108 Stat. 1796, 2037.  In 2023, Congress did away with § 2423(b)'s reference to "purpose," re-retiring the word for good.  *See* Preventing Child Sex Abuse Act of 2023, Pub. L. No. 118-31, § 5102(c), 137 Stat. 136, 934.  The 2023 amendments clarified that "intent" for all purposes in § 2423 "shall be construed as any intention to engage in [illicit sexual conduct] at the time of the interstate travel."  *Id.* § 5102(c)(4).  The 2023 legislative preamble further stated, "Federal law does not require that an abuser's intention to engage in sexual abuse be a primary, significant, dominant, or motivating purpose of the travel."  *Id.* § 5102(b)(9).

    We do not rely on the 2023 developments regarding § 2423(b) to inform our reading of § 2423(a).  Thompson was not charged under subsection (b), and he was charged before these amendments took effect.  Our discussion of the 2023 amendments is for the sake of completeness only.

    [5] The Eighth Circuit similarly noted, "Arguably, when Congress amended the Mann Act in 1986 . . . to remove the 'purpose' language . . . Congress lessened the prosecution's burden, such that it need not prove that illegal sexual activity was a purpose of the interstate transportation at all."  *United States v. Cole*, 262 F.3d 704, 709 (8th Cir. 2001).  Neither the First nor Eighth Circuits resolved this issue; rather, they affirmed under the "somewhat narrower and more stringent" "traditional Mann Act" approach.  *Ellis*, 935 F.2d at 391–92; *see Cole*, 262 F.3d at 709.  By not taking this path here, we do not suggest that the government's evidence would not have sufficed to convict Thompson under the old standard.

10

Section 2423(a) does not require a person's intent that a minor engage in illicit sexual conduct to be a "dominant," "compelling," or "motivating" purpose of transporting the minor for criminal liability to attach.

Nevertheless, what we actually held in those cases was that, to violate § 2423(a), "it is sufficient if [illicit sexual activity] was one of [the] defendant's 'efficient and compelling purposes'" for interstate travel with a minor, *Meacham*, 115 F.3d at 1495 (quoting *Dunn v. United States*, 190 F.2d 496, 497 (10th Cir. 1951)),[6] and "a defendant's . . . conviction may be sustained if one of his motivating or dominant reasons for bringing a minor with him on the trip is for illicit sexual activity," *Lacy*, 904 F.3d at 901 (citing *Meacham*, 115 F.3d at 1496)). Technically, those statements remain true. Proving that illicit sexual activity was one of the defendant's "dominant purposes" for transporting a minor across state lines will "*suffic[e]*" to convict under § 2423(a), *see Meacham*, 115 F.3d at 1495–96 (emphasis added); it is just more than what is *necessary* to do so. *Cf. United States v. Cryar*, 232 F.3d 1318, 1324 n.2 (10th Cir. 2000) (discussing favorably the argument that "dominant purpose" was beyond what was needed to convict under 18 U.S.C. § 2241(c), because "[§] 2241(c) states that 'intent,' not 'dominant purpose,' is required," but declining to resolve the issue because "[i]f the jury convicted [the

---

[6] *Meacham*'s citation to *Dunn* is perhaps a source of the confusion. *Dunn* was a § 2421 case, decided when § 2421 still referred to "purpose." 190 F.2d at 497–98. By *Dunn*'s time, § 2423(a) no longer used the word "purpose." And by *Meacham*'s time, § 2421 no longer used "purpose," either. *See, e.g.*, *Vang*, 128 F.3d at 1069 n.5.

defendant] of violating the higher standard . . . , it of necessity convicted him of the lower intent standard").

In sum, § 2423(a) prohibits what it says it prohibits:  the "knowing[] transport[ation of] an individual who has not attained the age of 18 years" across state lines "with *intent* that the individual engage in prostitution, or in any sexual activity for which any person can be charged with a criminal offense."  18 U.S.C. § 2423(a) (emphasis added).

## B.

The evidence sufficed to prove beyond a reasonable doubt that Thompson harbored the intent that A.T. engage in illicit sexual activities with him when he transported her to Texas.

The government presented evidence of Thompson's abuse against four victims—A.J., S.T., C.S., and A.T.—and, in each case, Thompson perpetrated the abuse when he knew there were no other adults around.  Thompson invited A.J. to engage in oral sex after Thompson's ex-wife had gone to bed.  He touched S.T. "multiple times a week," R. Vol. I at 420, but never when her mother was home.  He also subjected S.T. to oral sex when he knew S.T.'s mother was no longer around. And he abused C.S. when her mother was out "grocery shopping or taking kids to gymnastics," *id.* at 490, or when she and Thompson were alone in the car.  Based on Thompson's pattern of abusing children when he had them alone, a reasonable jury could infer that, when Thompson realized his wife would be unable to accompany

him and A.T. to the gymnastics meet, he transported A.T. to the Texas hotel with the intent to abuse her there.

The government also adduced evidence of Thompson's repeated use of hidden cameras to capture footage of his daughters undressing. The jury could take this as demonstrating a pattern of planning and preparing for inappropriate sexual acts, in turn further supporting the inference that Thompson intended to abuse A.T. in Texas.

Thompson resists, but he does not convince.[7] He stresses that he brought A.T. to Texas "to take her to a pre-scheduled gymnastics competition." Aplt. Br. at 10. He also argues that the fact that "his wife was not present was a circumstance that was not orchestrated by him, but rather occasioned by her insistence in moving up a colonoscopy as soon as possible." *Id.* at 11. But that the opportunity for Thompson to sexually abuse A.T. in Texas might have presented itself to Thompson fortuitously does not mean that he did not transport A.T. to Texas "with intent" that she engage in illegal sexual activities—namely, sexual activities with him—there. Likewise, that Thompson brought A.T. to Texas "with intent" that she compete in her gymnastics meet does not mean that he also did not bring her to Texas "with intent" that she engage in sexual activities with him.

Thompson's sufficiency challenge to his § 2423(a) conviction fails.

---

[7] These arguments are predicated on Thompson's erroneous view that § 2423(a) requires the above-discussed "dominant" or "compelling" "purpose." We nonetheless discuss these arguments to show that they do not entitle Thompson to relief under the proper "intent" standard.

**IV.**

We next turn to Thompson's sufficiency challenge to his conviction on Count Two, aggravated sexual abuse of a minor in Indian Country. Thompson argues that the evidence was insufficient to support the jury's finding on the "fourth element of the crime," that "Thompson was a non-Indian." Aplt. Br. at 12 (cleaned up).[8]

Count Two is predicated in part on 18 U.S.C. § 1152, which provides, in pertinent part, that "[t]his section shall not extend to offenses committed by one Indian against the person or property of another Indian." This means that "§ 1152 applies when 'the defendant is an Indian and the victim is a non-Indian, or vice-versa.'" *United States v. Walker*, 85 F.4th 973, 979 (10th Cir. 2023) (quoting *United*

---

[8] We note that the Tenth Circuit has granted rehearing en banc in two cases which raise the following question: "Under the General Crimes Act, 18 U.S.C. § 1152, is a defendant's non-Indian status an essential element that the indictment must allege and on which the government must bear the initial burden of production? Or is a defendant's non-Indian status an affirmative defense that the defendant must raise and bear the initial burden of production?" Order at 2, *United States v. Ruiz*, Nos. 24-2128, 24-7030 (10th Cir. May 5, 2026). However, we need not consider whether our precedent has properly allocated the burden of proving a defendant's non-Indian status in this case because, as discussed below, the government has carried the presently imposed (and more defendant-friendly) burden of proving beyond a reasonable doubt that Thompson is a non-Indian.

Additionally, Thompson's brief states that Thompson's non-Indian status "was an essential element to establish federal jurisdiction." Aplt. Br. at 8. We do not take this to suggest that Thompson thinks this bears on the district court's *subject matter* jurisdiction, but if it does, that is wrong. Consistent with Tenth Circuit precedent, the "[l]ack of such proof may support a challenge to the conviction for insufficient evidence but . . . it would not eliminate the court's subject matter jurisdiction." *United States v. Walker*, 85 F.4th 973, 978 (10th Cir. 2023). Instead (and how we understand Thompson's brief to use the term), "the Indian/non-Indian statuses of [a d]efendant and his victim[] are jurisdictional only in the sense that in the absence of those elements, no federal crime exists." *Id.* at 979 (quotation omitted).

14

*States v. Prentiss*, 256 F.3d 971, 974 (10th Cir. 2001) (en banc), *overruled in part on other grounds by United States v. Cotton*, 535 U.S. 625 (2002)).  The victim of Count Two was S.T., a member of the Muscogee (Creek) Nation.  The government thus had to prove, as the jury was instructed, that Thompson "was a non-Indian."  R. Vol. I at 287.

We have held that "a person qualifies as an Indian under § 1152 if they have 'some Indian blood' and are 'recognized as an Indian by a tribe or by the federal government.'"  *United States v. Simpkins*, 90 F.4th 1312, 1318 (10th Cir. 2024) (quoting *Walker*, 85 F.4th at 982).  Thus, "the government can prove that a person is not an Indian by showing that he fails either prong."  *Id.* (quoting *United States v. Diaz*, 679 F.3d 1183, 1187 (10th Cir. 2012)).

We hold that the government adduced sufficient evidence to prove beyond a reasonable doubt that Thompson was a non-Indian.  The government put forward two witnesses, both Thompson's family members, who testified that Thompson was not an Indian.  One witness was S.T., the victim and Thompson's eighteen-year-old (at the time of trial) daughter.  She testified that she and her mother are both enrolled members of the Muscogee (Creek) Nation, and she testified that Thompson was not an Indian.[9]  The other witness was Thompson's wife, Holly, who had been married to

---

[9] This is how S.T. testified:

Q.  Is your father an Indian?

A.  No.

Q.  Is your mother an Indian?

Thompson for twelve years. She also testified that Thompson is not an Indian and that he is not a member of any federally recognized tribe.[10] She further testified that she and S.T. had lived with Thompson since around 2010, when she and Thompson married.

Given the two witnesses' close familial relationships with Thompson, Thompson's non-Indian status was within their personal knowledge. *See Walker*, 85 F.4th at 983 (holding that the testimony of the defendant's niece, who lived "off and on" with defendant, that she was "not . . . aware of" the defendant's membership in any Indian tribe "was within the ambit of her reasonable personal knowledge"). And from there, the jury could choose to believe the witnesses' testimony to be accurate and find that the testimony—which, critically, went entirely unchallenged by Thompson—established the ultimate fact beyond a reasonable doubt.

---

    A. Yes.

    Q. And what tribe?

    A. Creek Nation.

    Q. Are you an enrolled member of the tribe?

    A. Yes.

R. Vol. I at 417. S.T.'s mother is Thompson's wife from his previous marriage.

[10] This is how Holly testified:

    Q. . . . Is he an Indian?

    A. No.

    Q. Is he a member of any federally recognized tribe?

    A. No.

R. Vol. I at 642.

Thompson argues that the testimonial evidence was insufficient to prove his non-Indian status. He says that the government should have provided documentary evidence—such as "genetic evidence that [ ] Thompson lacked *any* Indian blood," Aplt. Br. at 12, or evidence from "a database" to "check" whether Thompson was a member of a federally recognized tribe, *see* Oral Argument at 15:50–15:57. He alternatively argues that the government should have proven that the witnesses "had taken a particular interest in researching [ ] Thompson's genealogy" or "had access to government or tribal records and had searched without success for any recognition of [ ] Thompson as an Indian." Aplt. Br. at 13.

We disagree. Testimony alone can suffice to satisfy the government's burden of proof on an element of a criminal offense—including the element that the defendant was a non-Indian—even if the element could be satisfied more easily or with more certainty with documentary evidence. *See Cohen's Handbook of Federal Indian Law* § 11.02[1][b][iii] (Nell Jessup Newton & Kevin K. Washburn, eds., 2024) ("[T]he courts have given prosecutors substantial latitude in establishing non-Indian status."). For example, we have held this in the context of the element (appearing in federal bank robbery and bank fraud statutes) that a bank is federally insured. In *United States v. Bindley*, we held that testimony alone sufficed to prove beyond a reasonable doubt that a bank was federally insured, even though documentary evidence, like a certificate of insurance, might have "more clearly prove[n] th[at] element." 157 F.3d 1235, 1239 (10th Cir. 1998); *see also United States v. Iverson*, 818 F.3d 1015, 1024–25 (10th Cir. 2016) (holding the same even

17

though documentary evidence was "not difficult" to obtain).  In reaching that conclusion, "we emphasized" that the defendant "did not object to the evidence, did not cross-examine the witness about it, and did not offer any contrary evidence of his own."  *Bindley*, 157 F.3d at 1239 (cleaned up).

This logic applies and controls here.[11]  The government did not need to present documentary evidence to disprove Thompson's Indian status or, by the same token, corroborate the testimonial evidence with evidence that the witnesses had consulted any documentary proof.[12]  So holding is consistent with *United States v. King*, 172 F.4th 1188 (10th Cir. 2026), a case in which we held that testimony by two of the

---

[11] We have also, albeit in a nonprecedential decision, applied *Bindley*'s logic to the element that the victim was an Indian.  In *United States v. Laskey*, we held that the unchallenged testimony of (1) the victim's mother that the victim had some Indian blood and (2) the mother and the victim that the victim was an enrolled member of a federally recognized tribe collectively sufficed to prove beyond a reasonable doubt that the victim was an Indian.  No. 22-5115, 2024 WL 3898299, at *3–4 (10th Cir. Aug. 22, 2024) (unpublished).  We explicitly rejected the argument that the government was required to offer either (1) documentary evidence of the defendant's Indian blood or (2) documentary proof of tribal membership or testimony from a tribal representative.  *Id.*  We rely on *Laskey* for its persuasive value only.  *See* Fed. R. App. P. 32.1(a); 10th Cir. R. 32.1(A).

[12] We note that, in at least some ways, it makes even less sense to require the government to provide documentary evidence of a person's non-Indian status than it would to have required it to provide documentary evidence of a bank's federally (FDIC-)insured status.  As of the last time we were faced with this issue in the bank context, prosecutors had one-stop shops to check whether a bank was FDIC-insured: they could search through a comprehensive online federal database, or they could fax a request for a statement of coverage to the FDIC.  *See Iverson*, 818 F.3d at 1024–25 & nn. 2, 3.  But there is no such comprehensive federal database of Indian genealogy or national registry of members of federally recognized Indian tribes.  *See Establishing Indian Ancestry*, U.S. Dep't of the Interior, https://www.doi.gov/tribes/esablishancestr (last visited Apr. 6, 2026).

18

defendant's sisters sufficed to establish he was non-Indian. *Id.* at 1199.[13]  And in concluding that the testimonial evidence sufficed in this particular case, we again stress that the testimony of Thompson's wife and daughter that he was not an Indian went *wholly undisputed* by Thompson.  Thompson did not object to the testimony. He did not cross-examine either witness concerning his non-Indian status.  He did not himself testify that he is an Indian.  He did not even criticize this testimony during closing argument.

The testimonial evidence in this case may not have been as strong as potential documentary evidence that the government could have relied upon; but viewed in the light most favorable to the government, it was sufficient.  The testimonial evidence— even though the government was tasked with proving a negative—"did not need to irrefutably negate the possibility that" Thompson was an Indian.  *Cf. United States v. Flaming*, 133 F.4th 1011, 1021 (10th Cir. 2025) (holding that the government adduced sufficient evidence that the defendant was "not a national of" his "host nation," assuming *arguendo* it was an element the government had to prove).  The unchallenged testimony of Thompson's wife and daughter was more than a mere modicum of evidence, *see Jackson*, 443 U.S. at 320, and raised more than a mere suspicion, *see Smith*, 133 F.3d at 742, that Thompson was a non-Indian.

---

[13] In *King*, we also rejected the defendant's contention to that, in order to be sufficient, family member testimony needs to be supported by demonstrated genealogical knowledge.  172 F.4th at 1199 n.14.

Sufficient evidence supported the jury's finding that Thompson was not an Indian at the time he sexually assaulted S.T.

**V.**

For the foregoing reasons, we AFFIRM.